Filed 7/29/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| UN HUI NAM,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>      Defendant and Appellant. | C074796<br><br>(Super. Ct. No. 34201300138396CUWTGDS) |

APPEAL from a judgment (order) of the Superior Court of Sacramento County, Raymond M. Cadei, Judge.  Affirmed.

Gordon & Rees, George A. Acero; Sedgwick, Robert D. Eassa and Delia A. Isvoranu for Defendant and Appellant.

Bohm Law Group, Lawrance A. Bohm and Maria E. Minney for Plaintiff and Respondent.

The California anti-SLAPP statute was intended to counter the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances."  (Code Civ. Proc., § 425.16, subd. (a).)  It has been suggested that "[t]he cure has become the disease—

1

SLAPP motions are now just the latest form of abusive litigation." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 96 (dis. opn. of Brown, J.) (*Navellier*).) And the disease would become fatal for most harassment, discrimination, and retaliation actions against public employers if we were to accept the Regents of the University of California's (University) misguided reading of the anti-SLAPP law and reverse the trial court's denial of its motion to strike. We agree with plaintiff Un Hui Nam that defendant did not sustain its burden to demonstrate that the gravamen of her claims for sexual harassment and retaliation arose from defendant's protected First Amendment activity. The trial court's order therefore is affirmed.

## FACTS

The facts as alleged in the complaint and in plaintiff's declaration in opposition to the motion to strike are not at all clear. By all accounts, plaintiff, a new resident in the anesthesiology department at UC Davis Medical Center, got off to a rocky start in July of 2009. Ultimately, a judge or jury will have to determine if her missteps were trivial and if defendant, a teaching institution, responded appropriately. Suffice it to say, there appear to have been some tension and misunderstandings right from the beginning of her residency. What occurred thereafter and why is the subject of the underlying lawsuit.

In hindsight, plaintiff traces what she labels "retaliation" to an e-mail she drafted on September 1, 2009. One week earlier she had received an excellent evaluation of her performance. One evaluator included such favorable remarks as: "Impressed with the way Dr. Nam worked at level of training"; "She was well organized – showed good skills. Interacted effectively with others"; "She was instructive to medical student"; and "Anesthetic record neat thorough and complete." Her strengths included "attentive to patient needs" and "receptive to feedback."

In her e-mail of September 1 she asked for clarification whether residents were allowed to intubate patients. She expressed her disagreement with any policy that would compel the residents in an emergency to wait for the on-call team rather than

2

independently intubating a patient. She wrote passionately: "I certainly do appreciate the concept of resident supervision and attending liability, but I remain completely flabbergasted that this rumoured restriction of anesthesia residents rotating through the service not being able to intubate in the MICU may be erroneously passed on by previous and upper level anesthesia colleagues without it being an actual policy or least [*sic*], without explanation. It would seem irrational that we, with our specialized training in establishing and maintaining the airway, would be prohibited from using our critical skills in high acuity, life-threatening situations but instead have to contact and then wait for our esteemed anesthesia colleagues on call while we helplessly watch our patients decompensate. In the meantime, we can only busy ourselves doing other things which in my mind are in direct contradiction of the universal policy of the ABCs--Airway, Breathing, and everything else. If our current understanding of the policy is true, without understanding why it is implemented, it would seem to directly contribute to the morbidity and mortality of our patients. Time is, brain, heart, liver, kidneys and I'm fairly confident that our patients and their loved ones would appreciate that the life-saving skills of their resident physicians, even if they were attained in a previous life, i.e. residency training, were optimized rather than thwarted just because of what rotation we're on."

Plaintiff copied all of the residents. Some of these residents thereafter informed her that she should expect retaliation for sending it.

Defendant, however, insists the e-mail excited no such reaction. Rather, plaintiff's problems were of her own making and not her supervisors' efforts to retaliate. Before the e-mail was sent, an operating room service director had complained that plaintiff was resistant to performing an assignment, wore improper attire, ate and flossed on the job, and frequently disappeared from the intensive care unit. Thus, defendant's version consists of a series of complaints, warnings, investigations, and leaves of absence necessitated by plaintiff's shortcomings over a three-year period and culminating in her

3

ultimate dismissal. Because our resolution of this appeal rests on the first prong of the requisite anti-SLAPP analysis, we need not recite the minutiae of all that occurred during those three years. We will, however, provide a few pertinent highlights.

On September 22, 2009, Dr. Brian Pitts, the residency program director, sent plaintiff a "Letter of Expectation." In this letter, he detailed "a pattern of unprofessional behavior that requires immediate corrective action." Plaintiff's mentor responded critically to the letter. On October 2 he acknowledged that plaintiff had made a few minor mistakes due to her inexperience, but he expressed his concern that the manner in which they were being handled could seriously damage the residency program. He wrote, "We must ensure absolutely that Dr. Nam is not being singled out nor that she has been or will be the victim of bullying, harassment or retaliation.

"It is imperative that a professional environment is maintained at all times to avoid compromise in patient safety. Dr. Nam must be able to work and learn in an atmosphere that is free of fear and unprofessional behavior of all involved."

By December of 2009 Dr. Pitts had been replaced by Dr. Amrik Singh. Although hopeful that the change of director would allow her the opportunity for a new start, those hopes were dashed at a holiday party in December. In her declaration in opposition to the motion to strike, she asserts that Dr. Singh stopped her on the way to the restroom, told her how beautiful she was while staring at her chest, and signaled that she should follow him into the men's restroom. She was intimidated but ignored his advances. She believes the rebuff triggered further retaliation.

Five months later, Dr. Singh wrote plaintiff a "Letter of Warning." As in the Letter of Expectation, Dr. Singh chronicled examples of plaintiff's unprofessional conduct, including tardiness, an inability to get along with her coresidents, and irresponsibility in handling controlled substances.

In June 2010 the residency competency committee would not give plaintiff a passing grade for her past six months of clinical training because, in addition to the Letter

4

of Expectation and Letter of Warning, she did not score within the requisite 40th percentile on a standardized test. Because other residents who failed the test suffered no adverse consequences and were allowed to pass their clinical training, she believes she was "singled out" and "retaliated" against.

The record is replete with both complaints and testimonials about plaintiff's performance. Apparently she had a particularly good rapport with nurses. Defendant built a paper trail of warnings for unprofessional conduct and an inability to get along with other doctors. But many of defendant's allegations were not substantiated during the internal investigations that ensued, and the anesthesiology department was criticized repeatedly for what it did, and did not do, to teach plaintiff the clinical and interpersonal skills needed to succeed in the program.

For example, following a 14-day leave ordered by Dr. Singh in June of 2010, the investigation committee concluded there was no evidence there were any defects in plaintiff's clinical performance. To the contrary, she was a strong resident who did a good job. The committee did recognize, however, what it characterized as "interpersonal conflicts" involving personalities and teaching styles. Plaintiff had her fans and her detractors. The committee's report was dated July 22, 2010.

A year later, following an incident with Dr. Hong Liu, an attending physician, defendant again placed plaintiff on an investigatory leave for what turned out to be two and a half months. And again plaintiff was exonerated as to the primary accusation, that she had physically threatened others in the program.

Plaintiff returned to work, but the complaints followed. She alleges that defendant solicited the complaints. On December 8, 2011, the residency competency committee decided to dismiss her. Dr. Singh concurred with the decision. Plaintiff received a letter on December 28, 2011, notifying her of defendant's intent to dismiss her. Plaintiff appealed her dismissal. The "Step II" response to her appeal upheld the decision because of plaintiff's tardiness and mishandling of controlled substances.

5

The investigator, however, was equally critical of the anesthesiology department. She castigated the department for singling out plaintiff for unique treatment from the beginning of her residency in July of 2009. And she detailed examples where defendant showed a lack of interest in training plaintiff. "For example, early in her residency, where one attending wrote a letter stating that this trainee 'chipped' a tooth of what would seem an easy intubation on a patient. They had 'heard' she had had two such events before. This letter stated that this Attending would not allow this student to intubate any other of this Attending's patients. This appears to be an extreme response in a teaching institution. From my personal perspective, I would have been equally concerned about a faculty response such as this as I would have been about the ability of my resident. More appropriate responses could have been[:] to make sure this resident got appropriate instruction if needed, to document if this resident had more dental issues than the rest of the trainees, and/or to assign this trainee to research dental issues in the general field and at UC Davis in particular. Instead this stands in her file as one Attending's condemnation of an anesthesia resident's skill. Another example is the evaluations of Dr. Lui in her first year of training. He gave her failing marks in the Cardiothoracic Anesthesia rotation two months in a row. There was no comment written and none was sought from this faculty. When I asked about this, the Anesthesia residency director, seemed to be unaware that most other residency programs expect an extensive explanation from faculty for failing a resident.

"Another example of concerning use of disciplinary action instead of other teaching modalities was the use of investigatory leave in June 2010 to evaluate conduct regarding resident only arguments. If there was no danger to patients as a result of this argument, then it seems unusual to use investigatory leave to evaluate disputes where no threats or violence took place. Another concerning aspect of this leave was that none of the other participants in these events were put on leave. If one were going to use this investigative tool to determine the facts of the situation and then putting only one party

6

on leave that action suggests an assignment of [guilt] even before the investigation has begun. At the conclusion of the leave the 'guilt' was not assigned to her as a result of the investigation. However, the use of the words 'unprofessional conduct' was continued with reference to this episode in her subsequent disciplinary letters. She received a disciplinary action in May, June and July of 2010. The July letter using a Letter of Instruction is also something not commonly used but seems to assign 'blame' for events that were cleared up by the previous investigation. Each of the above three letters was about something different but in some way was referring to the previous issues. During this period there was no time for the trainee to actually address these issues and make any progress.

"By the time September 2011 arrived and she returned from an extended investigatory leave that was done to evaluate multiple complaints given by her fellow residents with regard to the use of either verbally [or] physically threatening behavior. These allegations were sincerely felt by many residents but were not substantiated during the almost 3 month investigation period. When she returned to the work in September 2011, despite this fact that none of the complaints were substantiated the environment she returned to was very difficult. I have never seen the volume of minutia [*sic*] documented in the multiple letters that were attached to the Letter of Intent to Dismiss."

Plaintiff requested, without success, a formal hearing to contest the termination. In January 2013 she filed her complaint for retaliation, discrimination, sexual harassment, wrongful termination, violations of the Business and Professions Code, and breach of contract. Defendant filed a motion to strike pursuant to section 425.16 of the Code of Civil Procedure, alleging that plaintiff's complaint constituted a SLAPP (strategic lawsuit against public participation) and arose from written complaints made in connection with an official proceeding. Defendant argued that the investigations and corrective action were protected conduct.

The trial court disagreed and denied the motion. In its tentative ruling, the court explained: " 'An anti-SLAPP motion is brought against a "cause of action" or "claim" alleged to arise from protected activity. (See § 425.16, subds. (b)(1), (3) & (c)(2).) The question is what is pled—not what is proven.' (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 942.) Plaintiff alleges that she was sexually harassed by Dr. Singh. She alleges that Dr. Singh thereafter retaliated against her by refusing to rollover vacation, issuing an unwarranted disciplinary letter, altering her personnel file, threatening to terminate her and placing her on investigatory leave. Plaintiff further alleges that she was retaliated against because she complained about the clinical behavior of another doctor and serious patient care and safety issues. As currently alleged, the adverse actions were not taken as a result of complaints regarding Plaintiff's performance or the investigations, but rather due to Plaintiff's rebuffing Dr. Signh's [*sic*] advances or her complaints regarding patient care.

"Accordingly, the Court finds that Defendant has fail [*sic*] to satisfy its initial burden of demonstrating that Plaintiff's action 'arises from' a protected activity."

In response to oral argument, the court was more direct. "I don't think you can parse through these words. When an employee complains about improper sexual advances, discrimination and harassment on the job due to a superior's conduct, that is not protected speech which is protected by a SLAPP motion.

". . . You can't hide that kind of conduct behind the concept that this is protected speech because ultimately in every employment situation the only way someone does anything is if they speak." The court reached the poignant conclusion, "Now, what was said during these hearings isn't the basis of her claim."

Defendant University appeals the denial of its motion to strike.

## DISCUSSION

The victim of abusive litigation designed to chill the exercise of rights under the First Amendment to the United States Constitution can bring a special motion to strike

8

the so-called SLAPP pursuant to section 425.16 of the Code of Civil Procedure. (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 821.) The anti-SLAPP statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1).)

By including an attorney fee provision (Code Civ. Proc., § 425.16, subd. (c)(1)) and admonishing the courts to construe the statute broadly (Code Civ. Proc., § 425.16, subd. (a)), the Legislature provides a strong incentive for a defendant to seek a very early dismissal under the anti-SLAPP measure rather than lodging a traditional motion for summary judgment. Over time, however, the Legislature recognized that the anti-SLAPP statute had as much potential for abuse as the litigation it was designed to thwart. "The Legislature finds and declares that there has been a disturbing abuse of [Code of Civil Procedure] Section 425.16, the California Anti-SLAPP Law, which has undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16." (Code Civ. Proc., § 425.17, subd. (a).) This case illustrates the potential danger of abusing the anti-SLAPP law.

Our de novo review of the trial court's denial of a motion to strike requires us to resolve the threshold inquiry whether defendant made a prima facie showing that the cause of action "arise[s] from" protected activity. (*Lee v. Fick* (2005) 135 Cal.App.4th 89, 95-96; *Olaes v. Nationwide Mutual Ins. Co.* (2006) 135 Cal.App.4th 1501, 1504-1505.) If defendant fails to meet its burden, we need not assess plaintiff's likelihood of prevailing on the merits. (*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 733 (*Freeman*).)

9

"The courts have struggled to refine the boundaries of a cause of action that arises from protected activity. In *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*Cotati*), the court explained that 'the statutory phrase "cause of action . . . arising from" means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether *the plaintiff's cause of action itself was based on an act in furtherance of* the defendant's right of petition or free speech.' (Second italics added.) In *Navellier,* the court cautioned that the 'anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' (*Navellier*, *supra*, 29 Cal.4th at p. 92.) Accordingly, the 'arising from' prong encompasses any action *based on* protected speech or petitioning activity as defined in the statute (*Id*., at pp. 89-95), regardless of whether the plaintiff's lawsuit was *intended* to chill (*Equilon* [*Enterprises v. Consumer Cause, Inc.* (2002)] 29 Cal.4th [53,] 58 [(*Equilon*)]) or *actually* chilled (*Cotati*, *supra*, 29 Cal.4th at p. 75) the defendant's protected conduct." (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 186-187 (*Martinez*); see *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 465.)

Defendant contends that plaintiff's complaint is based on the oral and written complaints it received about her performance, the various written warnings it provided her, the results of the ensuing investigations, and her written notice of termination. In defendant's view, each of the causes of action is based on a protected act as defined in Code of Civil Procedure section 425.16, subdivision (e), which provides in pertinent part: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, [or] (2) any written or oral statement or writing made in connection with an issue under consideration

10

or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law . . . .”

By stitching together a number of disparate legal principles extracted from cases with very different facts, *ignoring the fundamental question whether the lawsuit is indeed a SLAPP*, and divorcing the analysis from the purpose of the anti-SLAPP law, defendant constructs an argument that, in effect, would subject most harassment and retaliation claims against public entities to an anti-SLAPP motion to strike. Defendant’s logic is built on the following legal principles.

The entire disciplinary process, commencing with the receipt of complaints about an employee and proceeding through the investigation and disposition, constitutes an “official proceeding authorized by law.” In *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 198, a unanimous Supreme Court held that a hospital’s peer review, compelled by statute, qualifies as “any other proceeding authorized by law” identified in the anti-SLAPP statute, and therefore, a lawsuit arising out of a peer review proceeding is subject to a motion to strike the SLAPP suit. We extended the *Kibler* rationale to the grievance policies and procedures adopted by the University in *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1396, reasoning that they, like the peer review process, have the force and effect of a statute and thus fell within the anti-SLAPP statute’s “any other official proceeding authorized by law.” (*Ibid*.) Plaintiff does not suggest otherwise.

Defendant therefore insists that all of its conduct involving plaintiff was protected and plaintiff’s lawsuit was designed to chill the exercise of its right to petition, that is, its right to handle the complaints. But plaintiff counters that the gravamen of her complaint is not defendant’s investigation of complaints, but its harassment and retaliation. Here, defendant’s response falters. Defendant insists that motive is irrelevant in assessing the merits of an anti-SLAPP motion to strike. It is true the Supreme Court, honoring the legislative mandate to broadly construe the anti-SLAPP statute in order to curtail abusive

11

SLAPP's, instructs lower courts to focus on whether the gravamen of the action is based on protected conduct and to ignore the question whether the SLAPPer subjectively intended to chill the protected conduct. (*Navellier*, *supra*, 29 Cal.4th at p. 94; *Equilon*, *supra*, 29 Cal.4th at pp. 58-59.) In other words, the victim of a SLAPP has no burden to prove either that the SLAPPer intended to chill the exercise of its constitutional rights or that the exercise of the protected acts actually was chilled. And it is also true that defendant's argument finds some support in *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 268-269 (*Tuszynska*) and *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1520 (*Hunter*), wherein the Courts of Appeal translated subjective intent to mean motive and the mens rea of the SLAPPer to mean the mens rea of the defendant employer. But equating a SLAPPer's subjective intent in filing the litigation to an employer's *motive* in subjecting an employee to a retaliatory grievance procedure is a mistake and does violence to the purpose of both the anti-SLAPP and antiretaliation laws.

*Tuszynska* appears to have initiated the motive immunity in an alleged discrimination case. The plaintiff, a female attorney, claimed that a prepaid legal services plan would not refer cases to her and stopped funding the cases she had been previously assigned "because she is a woman." (*Tuszynska*, *supra*, 199 Cal.App.4th at p. 268.) The trial court denied the legal services plan's anti-SLAPP motion, allowing the plaintiff the opportunity to prove gender discrimination. (*Ibid*.) The Court of Appeal reversed. (*Id*. at p. 272.)

The court explained: "Plaintiff and the trial court thus drew a critical distinction between plaintiff's claim that she was not getting cases *because* she was a woman, on the one hand, and the communications defendants made in connection with making their attorney selection and funding decisions, on the other. This distinction conflates defendants' alleged injury-producing conduct—their failure to assign new cases to plaintiff and their refusal to continue funding cases previously assigned to her—with the unlawful, gender-based discriminatory *motive* plaintiff was ascribing to defendants'

12

conduct—that plaintiff was not receiving new assignments or continued funding *because* she was a woman.

"This type of distinction is untenable in the anti-SLAPP context because it is at odds with the language and purpose of the anti-SLAPP statute. The statute applies to claims 'based on' or 'arising from' statements or writings made in connection with protected speech or petitioning activities, regardless of any motive the defendant may have had in undertaking its activities, or the motive the plaintiff may be ascribing to the defendant's activities. (*Navellier*, *supra*, 29 Cal.4th at pp. 89-90; [Code Civ. Proc.,] § 425.16, subds. (b)(1), (e).)

". . . Whether defendants had a gender-based discriminatory motive in not assigning new cases to plaintiff or in defunding her existing cases is a question that is entirely separate and distinct from whether, under the anti-SLAPP statute, plaintiff's gender discrimination claims are *based on* defendants' selection and funding decisions. Courts must be careful not to conflate such separate and distinct questions." (*Tuszynska*, *supra*, 199 Cal.App.4th at pp. 268-269.)

*Hunter* employed the same analysis. The *Hunter* plaintiff filed a complaint against CBS alleging age and gender discrimination for not hiring him as a weather news anchor. (*Hunter*, *supra*, 221 Cal.App.4th at p. 1513.) As in *Tuszynska*, the plaintiff argued that the conduct underlying his causes of action was not CBS's selection of weather anchors, but the decision to use discriminatory criteria in the selection process. (*Hunter*, at pp. 1521-1522.) Relying on *Navellier* and *Tuszynska*, the Court of Appeal concluded: "This case cannot be meaningfully distinguished from *Tuszynska*. Hunter's employment discrimination claims assert that CBS did not hire him to serve as a weather anchor because of his age and gender. As in *Tuszynska*, his claims are thus based squarely on CBS's decisions regarding its choice of a weather anchor, which were acts in furtherance of its First Amendment rights. Whether CBS had a gender- or age-based discriminatory motive in not selecting Hunter to serve as a weather anchor is an entirely

13

separate inquiry from whether, under [Code of Civil Procedure] section 425.16, Hunter's discrimination claims are based on CBS's employment decisions." (*Hunter*, *supra*, 221 Cal.App.4th at p. 1523.)

Both the *Tuszynska* and *Hunter* courts purportedly based their conclusions that the employer's motive to discriminate was irrelevant in determining whether the defendant met its threshold burden to prove the conduct arose from protected activity on the Supreme Court's holding in *Navellier*. *Navellier*, however, did not involve harassment, discrimination, or retaliation. Nor did the Supreme Court address the defendant's subjective intent. Quite to the contrary, the Supreme Court determined that the SLAPPer's, not the defendant's, intent was irrelevant. Thus, in our view, *Navellier* does not require us to ignore the defendant's alleged motive in a harassment, discrimination, or retaliation case.

To conclude otherwise would subject most, if not all, harassment, discrimination, and retaliation cases to motions to strike. Any employer who initiates an investigation of an employee, whether for lawful or unlawful motives, would be at liberty to claim that its conduct was protected and thereby shift the burden of proof to the employee, who, without the benefit of discovery and with the threat of attorney fees looming, would be obligated to demonstrate the likelihood of prevailing on the merits. Such a result is at odds with the purpose of the anti-SLAPP law, which was designed to ferret out meritless lawsuits intended to quell the free exercise of First Amendment rights, not to burden victims of discrimination and retaliation with an earlier and heavier burden of proof than other civil litigants and dissuade the exercise of their right to petition for fear of an onerous attorney fee award.

*Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartments, LLC* (2007) 154 Cal.App.4th 1273 (*Alta Loma*) and *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611 (*Martin*) provide more apt analyses of anti-SLAPP motions in discrimination and retaliation cases. In *Alta Loma*, a landlord removed a

14

disabled tenant through unlawful detainer proceedings despite the fact she had notified him of her disability and was entitled to a year to find alternate housing before being evicted. The Department of Fair Employment and Housing (DFEH) filed a complaint against the landlord for disability discrimination. The trial court denied the landlord's motion to strike portions of the complaint as a SLAPP, "finding the gravamen of the complaint was for disability discrimination and for this reason the suit did not arise out of the landlord's petition to governmental authorities and protected communications it made in connection with removing its residential units from the rental market." (*Alta Loma*, at p. 1276.)

The Court of Appeal affirmed. Having reviewed the parties' pleadings and affidavits, as it must, the court agreed with the trial court that the gravamen of the lawsuit was disability discrimination. The court explained: "Contrary to Alta Loma's argument, the communications and the actual eviction itself were not the acts attacked in DFEH's complaint. Instead, the allegations of wrongdoing in DFEH's complaint arose from Alta Loma's alleged acts of failing to accommodate [the tenant's] disability. The letters, e-mail and filing of unlawful detainer actions constituted DFEH's *evidence* of Alta Loma's alleged disability discrimination." (*Alta Loma*, *supra*, 154 Cal.App.4th at pp. 1284-1285.)

Similarly, in *Martin,* the plaintiff, an African American, refused his supervisor's request to take punitive action against one of his employees, another African American, who had filed a racial discrimination claim. The supervisor, a Caucasian, took a variety of measures to undermine the plaintiff's authority, restructured his division, disgraced him, gave him a poor performance review, and persuaded the agency's board of directors to order the plaintiff to continue to report to him. The employer brought an anti-SLAPP motion. The Court of Appeal agreed with the trial court's finding. " 'This is an action for retaliation and wrongful termination filed by plaintiff . . . against his former employer . . . and . . . Supervisor . . . .' As the court observed, 'the gist of this action is clearly not

15

only defamation.' 'Moreover, if this kind of suit could be considered a SLAPP, then [employers] could discriminate . . . with impunity knowing any subsequent suit for . . . discrimination would be subject to a motion to strike and dismissal.' [Citation.] As the lower court in [*Alta Loma*, *supra*, 154 Cal.App.4th 1273] stated: ' "I just feel like to rule for the defendant in this case would be to say that [Code of Civil Procedure] section 425.16 provides a safe harbor for discriminatory conduct and I don't think that's what it's intended to do." ' [Citation.]" (*Martin*, *supra*, 198 Cal.App.4th at p. 625.)

We agree. Neither the rental property removal process or the unlawful detainer proceedings in *Alta Loma* nor the board hearing in *Martin* inoculated the defendants from discrimination claims. In those cases, the courts did not consider the defendants' motives at all. Rather, they looked to the allegations of wrongdoing and determined that in both cases the gravamen of the complaint was discrimination or retaliation. The mere fact that the discrimination or retaliation triggered protected activity does not mean that it arose from the protected activity. (*Cotati*, *supra*, 29 Cal.4th at pp. 76-77; *Equilon*, *supra*, 29 Cal.4th at p. 66.) In other words, " ' the mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' " (*City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1307.) Nor does protected activity that is incidental to a cause of action justify an anti-SLAPP dismissal. (*Freeman*, *supra*, 154 Cal.App.4th at p. 733; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672.) In short, we conclude the anti-SLAPP statute was not intended to allow an employer to use a protected activity as the means to discriminate or retaliate and thereafter capitalize on the subterfuge by bringing an anti-SLAPP motion to strike the complaint. In that case, the conduct giving rise to the claim is discrimination and does not arise from the exercise of free speech or petition.

Yet another example of an employer's unsuccessful attempt to strike causes of action for retaliation and wrongful termination appears in *McConnell v. Innovative Artists*

16

*Talent & Literary Agency, Inc.* (2009) 175 Cal.App.4th 169 (*McConnell*).  Two talent agents, believing that provisions in their contracts were unlawful, filed declaratory relief actions against a talent agency (Innovative) requesting declarations that they had the right to terminate their agreements at will.  (*Id*. at p. 172.)  The following day, Innovative had the agents escorted off the premises, gave them letters modifying their job duties, and instructed them not to come onto the premises, use company e-mail, attend client or industry functions, or have any communication with clients or other employees.  (*Ibid*.)  Two days later they were formally terminated.  (*Ibid*.)  The agents amended their complaints to add causes of action for retaliation and wrongful termination.  (*Ibid*.)

Innovative moved to strike the retaliation and wrongful termination causes of action, asserting that the agents' claims arose from protected First Amendment activity.  (*McConnell*, *supra*, 175 Cal.App.4th at p. 172.)  Innovative argued that the letters written by Scott Harris, Innovative's president, and delivered to the agents modifying their job duties after their lawsuits were filed were written communications "made in connection with an issue under consideration or review" in the lawsuits.  (Code Civ. Proc., § 425.16, subd. (e)(2); see *McConnell*, at p. 176.)  The trial court denied the motions and the Court of Appeal affirmed.  (*McConnell*, at p. 173.)

The Court of Appeal rejected the notion that the gravamen of the agents' complaints was the letters modifying their job duties.  Rather, "the acts underlying [plaintiff] McConnell's claims of retaliation and wrongful termination consisted of a course of conduct by Innovative on August 28 that prevented McConnell and [plaintiff] Press from performing their work as talent agents.  McConnell's claims do not arise from Harris's letter, but from Harris's action 'temporarily modif[ying]' McConnell's and Press's job duties, effectively precluding them from engaging in any of the ordinary activities of a talent agent.  The fact that these 'modifications' to McConnell's job duties were reduced to writing does not convert them from conduct affecting the conditions of employment to protected free speech activity.  We look to the gravamen of a plaintiff's

17

complaint to see if it is based on a defendant's protected First Amendment activity. (See *Martinez*[, *supra*,] 113 Cal.App.4th [at p.] 188 ['it is the *principal thrust* or *gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies . . .'].) Here, McConnell's causes of action for retaliation and wrongful termination were based on Innovative's conduct effectively eliminating all the normal job duties of a talent agent—as reflected both in Harris's letter and in Innovative's other conduct described in the amended complaints: escorting McConnell and Press from the office, deactivating their e-mail and computer access, and so on." (*McConnell*, *supra*, 175 Cal.App.4th at pp. 176-177.)

Similarly, defendant points to plaintiff's allegations referencing its Letter of Expectation, Letter of Warning, and other written communications notifying her she would be put on leave, terminated, etc., and argues, as the talent agency did in *McConnell*, that these writings were all protected activity. Here, unlike in *McConnell*, there was no pending litigation at the time defendant gave plaintiff the various notices she alleged in her complaint. But the underlying principle remains the same. The gravamen of plaintiff's and McConnell's and Press's complaints was based on their employers' conduct in retaliation. For plaintiff those retaliatory acts included, but were not limited to, "subjecting her to increased and disparate scrutiny, soliciting complaints about her from others, removing [her] from the workplace, refusing to permit her to return, refusing to give her credit towards the completion of her residency, failing to honor promises made regarding her treatment, and ultimately terminating her on February 2, 2012." Following the lead of our colleagues in *McConnell*, we reject defendant's characterization of its retaliatory conduct as protected First Amendment activity.

Nevertheless, it is important to emphasize the murkiness of the factual allegations before us. If, as defendant portrays the facts, it had been deluged with complaints about plaintiff's performance and it had merely proceeded to discipline her in a manner commensurate with her shortcomings in the absence of evidence of retaliation, its acts

18

might be characterized as protected. But plaintiff alleges that the discipline that was meted out, including the ultimate termination, was all in retaliation for her public challenge of department policies and her rejection of Dr. Singh's inappropriate overtures. The timeline is compressed and ambiguous. According to plaintiff, she received an exemplary review at the end of August 2009, on September 1 she e-mailed her inquiry about the purported policy that residents were not allowed to intubate patients, she received a Letter of Expectation on September 22, Dr. Singh harassed her in December, and all that followed was in retaliation for her candor and her dismissal of his advances. According to defendant, plaintiff exhibited unprofessional conduct shortly after she started the program in July of 2009, thus triggering its constitutional right, indeed its duty, to investigate the complaints and discipline her accordingly.

Given that defendant's own internal investigations criticized and exonerated both plaintiff for unprofessional conduct and defendant for "singling" out plaintiff and falling abysmally short of its teaching and mentoring responsibilities, it is far too premature to exonerate defendant for engaging in protected conduct. As early as October of 2009 plaintiff's own mentor cautioned the department to ensure that plaintiff was "not being singled out nor that she has been or will be the victim of bullying, harassment or retaliation." Plaintiff's complaint and declaration make perfectly clear that the basis of her claim, as in *Alta Loma* and *Martin*, was defendant's retaliation—punishing her for rebuffing Dr. Singh and calling attention to problems with the department's policies and procedures. In an anti-SLAPP analysis, we must accept as true the plaintiff's pleaded facts. (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 54.) "We do not resolve the merits of the overall dispute, but rather identify whether its pleaded facts fall within the statutory purpose." (*Ibid*.) Thus, the trial court properly denied defendant's anti-SLAPP motion because the alleged wrongdoing did not arise out of protected conduct.

19

Moreover, we question whether plaintiff's lawsuit for harassment and retaliation should be characterized as a SLAPP. The quintessential SLAPP is filed by an economic powerhouse to dissuade its opponent from exercising its constitutional right to free speech or to petition. The objective of the litigation is not to prevail but to exact enough financial pain to induce forbearance. As its name suggests, it is a strategic lawsuit designed to stifle dissent or public participation. It is hard to imagine that a resident's complaint alleging retaliatory conduct was designed to, or could, stifle the University from investigating and disciplining doctors who endanger public health and safety. The underlying lawsuit may or may not have merit that can be tested by summary judgment, but it is quite a stretch to consider it a SLAPP merely because a public university commences an investigation.

## DISPOSITION

The trial court's denial of the University's special motion to strike is affirmed. Plaintiff shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                                        RAYE          , P. J.


We concur:


     NICHOLSON     , J.


     BUTZ          , J.

20