Filed 7/26/2017

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ARAM BONNI,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>ST. JOSEPH HEALTH SYSTEM et al.,<br><br>    Defendants and Respondents. | G052367<br><br>(Super. Ct. No. 30-2014-00758655)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Andrew P. Banks, Judge. Reversed.

Greene, Broillet & Wheeler, Mark T. Quigley, Scott H. Carr, Christian T.F. Nickerson; Esner, Chang & Boyer, Stuart B. Enser and Joseph S. Persoff for Plaintiff and Appellant.

Arent Fox, Lowell Brown, Debra J. Albin-Riley and Diane Roldan for Defendants and Respondents.

\* \* \*

Plaintiff Aram Bonni, a surgeon, sued St. Joseph Hospital of Orange (St. Joseph), Mission Hospital Regional Medical Center (Mission), and other defendants for, inter alia, retaliation under Health and Safety Code, section 1278.5 (the whistleblower statute).[1] Plaintiff alleged defendants retaliated against him for his whistleblower complaints by summarily suspending his medical staff privileges and conducting hospital peer review proceedings.

In response to plaintiff's filing of his first amended complaint (FAC), defendants filed a special motion under Code of Civil Procedure section 425.16 (the anti-SLAPP statute)[2] to strike plaintiff's retaliation cause of action, asserting his claim arose from the protected activity of hospital peer review proceedings.

The court granted defendants' anti-SLAPP motion as to both St. Joseph and Mission. The court determined, first, that defendants had met prong one of the anti-SLAPP statute's two-part test, which requires a moving defendant to show the plaintiff's claim arose from activity protected under that statute. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).)

The court then proceeded to prong two of the anti-SLAPP test, which requires a plaintiff to show a probability of prevailing on his or her claim. (*Equilon*, *supra*, 29 Cal.4th at p. 67.) The court concluded plaintiff's proof failed as to both defendants.

---

[1] Plaintiff's operative complaint also named as defendants some other entities and individuals related to Mission and/or St. Joseph.

The whistleblower statute prohibits health facilities from retaliating against, inter alia, a member of the medical staff of the health facility because that person has presented a grievance, complaint, or report to the facility or its medical staff. (Health & Saf. Code, § 1278.5, subd. (b)(1)(A).)

[2] The acronym SLAPP (strategic lawsuit against public participation) refers to a harassing lawsuit brought to challenge the exercise of constitutionally protected free speech rights. (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 196 (*Kibler*).)

We conclude plaintiff's retaliation claim under the whistleblower statute arose from defendants' alleged acts of retaliation against plaintiff because he complained about the robotic surgery facilities at the hospitals, and *not* from any written or oral statements made during the peer review process or otherwise. Discrimination and retaliation claims are rarely, if ever, good candidates for the filing of an anti-SLAPP motion. This case is no exception. Accordingly, defendants' motion to strike fails on prong one of the anti-SLAPP test and we reverse the order granting defendants' motion.

FACTS

*Plaintiff's FAC*

Plaintiff's FAC alleged, inter alia, that defendants violated the whistleblower statute by retaliating against him for reporting "suspected unsafe and substandard conditions and services" at defendants' hospitals, including defendants' lack of committed assistants for robotic surgical procedures, and defendants' malfunctioning robot, camera, and bleeding-control devices. The FAC alleged defendants retaliated against plaintiff for his whistleblower complaints by, inter alia, suspending and ultimately denying him his medical staff privileges, after subjecting him to a lengthy and humiliating peer review process.

*Defendants' Anti-SLAPP Motion*

In response, defendants filed an anti-SLAPP motion to strike the FAC's retaliation cause of action. Defendants argued: "Plaintiff . . . exhibited consistent patterns of poor judgment and surgical techniques that caused serious complications — and in some cases near death — for his patients. . . . In light of the imminent danger to future patients of these serious and life-threatening behaviors, Defendants summarily suspended Plaintiff and thereafter conducted peer review proceedings according to

3

California law and the Hospitals' bylaws, to ensure patient safety." Defendants further argued that (1) plaintiff's retaliation claim arose from defendants' peer review processes; (2) such processes constitute protected activity under the anti-SLAPP statute; and (3) plaintiff could not show a probability of success on his retaliation claim because he lacked "admissible evidence indicating Defendants acted to retaliate against him."[3]

Defense counsel filed a declaration in support of defendants' anti-SLAPP motion. Exhibit 1 to counsel's declaration was the decision of St. Joseph's judicial review hearing committee, which stated that plaintiff experienced complications in three of the first six robotic procedures he performed at St. Joseph. Exhibit 3 to counsel's declaration included Mission's appellate committee report, which stated that the "focused review process was triggered by a December, 2009 case in which [plaintiff] perforated the patient's mesentery and bowel tissue five . . . times. The patient suffered various complications following the procedure, required a second surgery to repair the perforations, . . . and endured a protracted hospital stay."

*Plaintiff's Opposition*

Plaintiff opposed defendants' anti-SLAPP motion, arguing defendants failed to show his claim was a SLAPP, and alternatively, that plaintiff could make "the minimal showing necessary to establish a probability of prevailing on the merits."

In plaintiff's declaration supporting his opposition, he declared, inter alia: "In or about March of 2009, I became aware of numerous patient safety issues involving the da Vinci robot . . . robotic surgery program at Mission Hospital. Specifically, the robotic surgery program at Mission was grossly understaffed and underfunded, which had a direct and adverse impact on patient safety. At times, I was unable to complete

---

[3] Defendants further argued, as to St. Joseph, that plaintiff had signed a release. Plaintiff's declaration supporting his opposition to defendants' anti-SLAPP motion contended St. Joseph breached the "settlement agreement."

4

scheduled surgeries due to inadequate staffing. On October 19, 2009, I reported these patient safety concerns to Dennis Haghighat M.D., vice president of medical affairs at Mission. I requested that these issues be corrected in order to improve the safety of patients at Mission and St. Joseph. A true and correct copy of this report is attached hereto as Exhibit 2. Unfortunately, Mission and St. Joseph did nothing to correct or address these patient safety concerns."

Exhibit 2 is plaintiff's October 19, 2009 e-mail message to Haghighat, in which plaintiff stated he had been forced to cancel a few robotic surgeries due to the unavailability of an assistant surgeon and asking if Mission could allocate a scrub technician to serve as the assistant. The subject line of plaintiff's e-mail message is "Robotic Surgery at Mission." In this e-mail message, plaintiff never mentions St. Joseph.

Plaintiff's declaration continued: "On December 22, 2009, I performed a robotic surgical procedure at Mission on an elderly woman . . . . During this surgery, the da Vinci robot malfunctioned which caused serious patient safety issues, including complications during the surgery, as well as a 42 minute delay. Specifically, the 3D Camera on the robot malfunctioned. Due to inadequate staffing and training, the Mission Staff had extreme difficulties correcting the problem with the robot. After some delay, the Mission Staff finally located the replacement camera and brought it in. Unfortunately, the Mission Staff were unfamiliar with [the] existence and location of that camera. Following the issue with the camera, the Monopolar scissors, as well as the cautery, on the robot malfunctioned. This is the instrument that is used to cauterize and cut tissues. This instrument was later recalled by Intuitive Surgical Inc., the manufacturer of the da Vinci robot. . . . [¶] . . . Once again, I reported these patient safety concerns regarding the malfunctioning da Vinci robot to Dennis Haghighat, M.D on January 11, 2010. . . . A true and correct copy of this report is attached hereto as Exhibit 3. Instead of addressing these issues, Mission referred the case to the Quality Review Committee

5

for outside review of my performance of the December 22, 2009 surgery. I believe that this was done in retaliation for my reports regarding the inadequate robotics program and substandard hospital equipment and staff."

Exhibit 3 is a string of e-mail messages, starting with plaintiff's December 22, 2009 e-mail statement to an alleged da Vinci representative that the camera, port assistant, and other problems had consumed 42 minutes. The da Vinci representative acknowledged "the camera had some issues," but also stated "no other robotically trained surgeons at Mission [have had] this many repeated issues on every case." Plaintiff then e-mailed Haghighat that "[w]e need some people that are well trained robotically to be in the room to help trouble shoot the problems that are encountered" and that "losing about 42 minutes to side issues during an already long and winding surgery could and should be avoided."

Plaintiff's declaration continued: "On or about April 30, 2010, in the interest of patient safety, I once again reported my concerns regarding the malfunctioning da Vinci robot and inadequate robotic program to [Nolan, Mission's chief of staff, and Kenneth Rexinger, M.D., Mission's chief of quality review]. . . . Specifically, I again reported the following patient safety concerns: (1) the lack of a committed assistant for the procedure, (2) lack of committed [operating room] staff, (3) lack of appropriately trained scrub techs, (4) lack of availability of appropriate instruments in general, (5) the malfunctioning camera on the da Vinci robot and (6) the malfunctioning of the devices on the da Vinci robot to control bleeding. A true and correct copy of this report is attached hereto as Exhibit 4. . . ."

Exhibit 4 is plaintiff's letter to Nolan, explaining the circumstances surrounding the December 22, 2009 robotic surgery and reciting the above six patient safety concerns. The letter is undated, but allegedly sent in March 2010.

Plaintiff's declaration continued: "On August 20, 2010, I reported my concerns regarding the malfunctioning robot again to Defendant Dr. Juan Velez, Chief of

6

Obstetrics/Gynecology at St. Joseph. On September 15, 2010 I reported these same concerns to Defendant Randy Fiorentino at St. Joseph. As outlined in further detail below, I also reported these patient concerns yet again to Mission on October 1, 2010 and November 11, 2010. See Exhibits 5 and 6." (Italics added.)

Exhibit 5 is plaintiff's October 1, 2010 letter to Thomas Bailey, M.D., chief of Mission's department of women and infants, attaching a copy of plaintiff's March 2010 letter to Nolan and a copy of an October 1, 2010 letter to Bailey from Dr. Michael Hibner of the Creighton University School of Medicine, opining that "during the December 2[2], 2009 surgery," plaintiff "did *not* deviate from the standard of care." (Italics added.)

Exhibit 6 consists of plaintiff's November 11, 2010 e-mail communications with Jane Kessinger of Mission's medical staff office, attaching copies of documents for purposes of plaintiff's peer review process.

Plaintiff's declaration continued: "The December 22, 2009 case . . . was reviewed by Mission's own expert Dr. Moses, who determined that my performance during this surgery was within the standard of care. . . . Dr. Hibner also reviewed my performance during this surgery, and found that I was within the standard of care. Dr. Hibner is double board certified in Urogynecology and minimally invasive surgery. He teaches robotic surgery to advanced pelvic surgeons, and has performed thousands of robotic surgeries. . . . Further, and perhaps most telling, on March 22, 2010, Mission Director of Medical Staff Services Denise Rollins reported to St. Joseph that I was a member in good standing at Mission, that there were no disciplinary actions against me, and that there were no significant issues with respect to me or my practice at Mission."

*Defendants' Reply*

In their reply memorandum, defendants argued that all activities at issue in plaintiff's retaliation claim constituted protected peer review activities at Mission and St.

Joseph. Plaintiff could not show a probability of success because he had no admissible evidence that such "peer review activities were motivated by retaliatory animus." Defendants' actions "were motivated by concerns for patient safety because of Plaintiff's poor surgical technique . . . ." As to St. Joseph, plaintiff failed to submit any admissible evidence "that he actually made a complaint to St. Joseph's Dr. Velez on August 20, 2010 or to Dr. Fiorentino on September 15, 2010." As to Mission, even assuming Mission took adverse actions within 120 days of plaintiff's reporting patient safety concerns (so as to trigger the rebuttable presumption of retaliation under subdivision (d)(1) of the whistleblower statute), an employer can rebut the presumption "by articulating a legitimate, nondiscriminatory reason for the challenged action." "Once the employer does so, the presumption disappears and the employee must point to evidence which nonetheless raises a rational inference that retaliation occurred."

*The Court's Ruling*

The court granted defendants' anti-SLAPP motion as to both Mission and St. Joseph. Applying the first prong of the anti-SLAPP test, the court determined that the gravamen of plaintiff's retaliation claim was based on defendants' protected hospital peer review activities.

Proceeding to the second prong of the anti-SLAPP statute, the court ruled that the plaintiff had failed to meet his burden to demonstrate a probability of prevailing on his retaliation claim.

DISCUSSION

*General Principles of Applicable Law*

In evaluating an anti-SLAPP motion, the court conducts a potentially two-step inquiry. (*Equilon*, *supra*, 29 Cal.4th at p. 67.) First, the court must decide whether

8

the defendant has made a threshold showing that the plaintiff's claim *arises from* protected activity. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) To meet its burden under the first prong of the anti-SLAPP test, the defendant must demonstrate that its act underlying the plaintiff's claim fits one of the categories spelled out in subdivision (e) of the anti-SLAPP statute. (*Navellier*, at p. 88.) One such category of protected activity includes "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other proceeding authorized by law." (Code Civ. Proc., § 425.16, subd. (e)(2).)

Second — *if* the defendant meets its burden of showing all or part of its activity was protected — then the court proceeds to the next step of the inquiry. At this stage — applying the second prong of the anti-SLAPP test — the court asks "whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon*, *supra*, 29 Cal.4th at p. 67.)

An appellate court reviews a trial court's ruling on an anti-SLAPP motion de novo, applying the legal principles and two-prong test discussed above. (*Schaffer v. City and County of San Francisco* (2008) 168 Cal.App.4th 992, 998.) Here, we conclude defendants' motion fails on the first prong. Plaintiff's cause of action for retaliation under the whistleblower statute is not a SLAPP. It does not arise from protected activity. Thus, we need not analyze whether plaintiff has demonstrated a probability of prevailing.

*Plaintiff's Retaliation Claim Does Not Arise From Protected Activity*

We turn then to the first prong of the anti-SLAPP test, i.e., whether plaintiff's retaliation claim *arose from* protected activity under the anti-SLAPP statute. Plaintiff concedes he alleged retaliatory acts by defendants "that arose during [hospital] peer review proceedings." (*Kibler*, *supra*, 39 Cal.4th at p. 198.) But he argues his retaliation claim against defendants "arises out of [their] decisions to initiate the summary suspensions."

9

Recently, in *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057 (*Park*), our Supreme Court reiterated and clarified what it had said 15 years ago in *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78: "'[T]he defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.'" (*Park,* at p. 1063.) The plaintiff in *Park* was a tenure-track assistant professor at the defendant university. When the university denied his application for tenure, Park, who was of Korean national origin, sued the university for national origin discrimination. The university responded with an anti-SLAPP motion. (*Id.* at p. 1061.) Our Supreme Court concluded the plaintiff's claim did not *arise from* an act in furtherance of speech or petitioning activity and therefore was not subject to the anti-SLAPP statute. (*Id.* at pp. 1060-1061.) The *Park* decision was issued after oral argument in this case. At our request, the parties submitted supplemental letter briefs on the applicability, if any, of the *Park* decision to the issues presented by this appeal.

In *Park*, the high court examined the nexus that must be shown "between a challenged claim and the defendant's protected activity," and held that "a claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity." (*Park*, *supra*, 2 Cal.5th at p. 1060.) "Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Ibid.*) The lower appellate court in *Park* had ruled that a "claim alleging a discriminatory decision is subject to a motion to strike so long as protected speech or petitioning activity contributed to that decision." (*Id.* at p. 1061.) The Supreme Court *reversed* that reasoning as erroneous. (*Ibid.*)

Thus, the *Park* court made clear that in evaluating whether plaintiff's claim is a SLAPP, it is not sufficient merely to determine whether plaintiff has alleged activity protected by the statute. The alleged protected activity must also form the basis for

plaintiff's claim. The *Park* court counseled that "in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park*, *supra*, 2 Cal.5th at p. 1063.)

Accordingly, as suggested by *Park*, we first consider the elements of a claim under the whistleblower statute at issue here, Health and Safety Code, section 1278.5. As relevant to our inquiry, it provides, "No health facility shall discriminate or retaliate, in any manner, against any . . . member of the medical staff . . . of the health facility because that person has" "[p]resented a grievance, complaint, or report to the facility . . . or the medical staff of the facility . . . ." (Health & Saf. Code, § 1278.5, subd. (b)(1)(A).) Plainly, a defendant health facility may take all manner of adverse actions against an employee or medical staff member (including protected activities defined in subdivision (e) of the anti-SLAPP statute) without violating section 1278.5, so long as the adverse action is not taken to discriminate or retaliate because the employee or staff member made a complaint to the facility. In the absence of a retaliatory or discriminatory purpose motivating the adverse action, there is simply no liability under Health and Safety Code section 1278.5. Thus, the *basis* for a retaliation claim under section 1278.5 is the retaliatory purpose or motive for the adverse action, not the adverse action itself. In the language of the anti-SLAPP statute, the claim under section 1278.5 *arises from* defendants' retaliatory purpose or motive, and not from how that purpose is carried out, even if by speech or petitioning activity.

In defendant's letter brief, they argue that summary suspensions and terminations of a physician's medical privileges are protected activities under prong one of the anti-SLAPP test. Defendants attempt to distinguish the hospital peer review process from the "deliberative process involving a university president's tenure"[4] that

---

[4] *Park* involved the denial of tenure to "a tenure-track assistant professor," not a university president. (*Park*, *supra*, 2 Cal.5th at p. 1061.)

11

was at issue in *Park*. Defendants note that the "complex, multi-faceted" hospital peer review process is based on a statutory scheme intended to "protect the health and welfare of the people of California." (Bus. & Prof. Code, § 809, subd. (a)(6).) Defendants conclude, "Given the critical public interest in patient safety, [defendants] contend that notwithstanding the *Park* decision, all acts in furtherance of the [hospital] peer review process — including preliminary physician reviews, initial investigations, summary suspensions, committee hearings, and a hospital governing board's decision to accept disciplinary recommendations such as termination of privileges — are 'subject to a special motion to strike.'"

But the defendant in *Park*, *supra*, 2 Cal. 5th 1057, similarly argued "that decisions and the deliberations that underlie them are indistinguishable for anti-SLAPP purposes" (*id*. at p. 1069), relying on *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, which involved hospital peer review proceedings. (*Park*, at p. 1069.) The Supreme Court rejected the defendant's argument. The *Park* court clarified that the *only* issue decided in *Kibler* was whether a hospital peer review proceeding was an ""official proceeding"" within the meaning of the anti-SLAPP statute. *Kibler* did *not* "consider whether the hospital's peer review decision and statements leading up to that decision were inseparable for purposes of the arising from aspect of an anti-SLAPP motion." (*Park*, at p. 1069.) *Park* disapproved *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65, and *DeCambre v. Rady Children's Hospital-San Diego* (2015) 235 Cal.App.4th 1, to the extent they "overread *Kibler*," noting that *Kibler* does *not* stand for "the proposition that disciplinary decisions reached in a peer review process, as opposed to statements in connection with that process, are protected." (*Park*, at p. 1070.) To that we would add: It matters not whether activity can be described as "protected" as meeting one of the definitions of protected activity in subdivision (e) of the anti-SLAPP statute. What matters is whether plaintiff's claim arises from that activity. Here, where liability under the whistleblower statute is

12

premised on retaliatory adverse action taken in response to a protected complaint, the plaintiff's claim arises from the retaliatory motive or purpose.

Here, defendants' motion to strike was premised on their somewhat ipse dixit notion that because of the "critical public interest in patient safety," and "the courts' overriding goal of 'protect[ing] the health and welfare of the people of California,'" the peer review decision, and the statements leading up to that decision are "an inherently communicative process based on free speech and petitioning rights," and "should thus be 'subject to a special motion to strike.'" But merely because a process is communicative does not mean that plaintiff's claim necessarily arises from those communications, and merely because the peer review process serves an important public interest does not make it subject to the anti-SLAPP statute where the process is employed for a retaliatory purpose. The anti-SLAPP statute protects "*any written or oral statement or writing* made in connection with an issue under consideration or review by [an] official proceeding authorized by law." (Code Civ. Proc., § 425.16, subd. (e)(2), italics added.) Plaintiff did not allege *any* specific "written or oral statement or writing" which allegedly formed the basis of his retaliation claim. Instead, he alleged that an abusive peer review process was initiated by the hospitals because he made complaints about unsafe conditions at the hospitals. Thus, his claim was *not* based merely on defendant's act of initiating and pursuing the peer review process, or on statements made during those proceedings — but on the retaliatory purpose or motive by which it was undertaken.

The *Park* decision cannot be easily distinguished. Although *Park* involved a university tenure process conducted in an allegedly discriminatory fashion, its rationale translates easily to the allegedly retaliatory peer review process at issue here. Here is what the court said in *Park*, "The elements of Park's claim . . . depend not on the grievance proceeding, any statements, or any specific evaluations of him in the tenure process, but only on the denial of tenure itself and whether the *motive* for that action was impermissible. The tenure decision may have been communicated orally or in writing,

13

but that communication does not convert Park's suit to one arising from such speech. The dean's alleged comments may supply evidence of animus, but that does not convert the statements themselves into the basis for liability." (*Park*, *supra*, 2 Cal.5th at p. 1068, italics added.)

The high court's analysis in *Park* relied in part on the recent case of *Nam v. Regents of University of California* (2016) 1 Cal.App.5th 1176 (*Nam*), a case not involving a peer review process, but nevertheless bearing similarity to the case at bar. (*Park*, *supra*, 2 Cal.5th at p. 1066.) As described in *Park*, the *Nam* case concerned a "plaintiff, a University of California, Davis, medical resident, [who] sued for sexual harassment, discrimination, and wrongful termination. The defendant Regents of the University of California's (Regents) anti-SLAPP motion contended the suit arose from communicated complaints about the plaintiff's performance, written warnings it issued her, an investigation it conducted, and the written notice to the plaintiff of her termination. Not so; the basis for liability was instead the Regents' alleged retaliatory conduct, including "'subjecting [the plaintiff] to increased and disparate scrutiny, soliciting complaints about her from others, removing [her] from the workplace, refusing to permit her to return, refusing to give her credit towards the completion of her residency, failing to honor promises made regarding her treatment, and ultimately terminating her . . . .'"'" (*Park*, at p. 1066.) The *Park* court summed up its analysis of the *Nam* decision stating, "*Nam* illustrates that while discrimination may be carried out by means of speech, such as a written notice of termination, and an illicit animus may be evidenced by speech, neither circumstance transforms a discrimination suit to one arising from speech. What gives rise to liability is not that the defendant spoke, but that the defendant denied the plaintiff a benefit, or subjected the plaintiff to a burden, *on account of a discriminatory or retaliatory consideration*." (*Park*, at p. 1066, italics added.)

The *Nam* court itself was quite direct in announcing its decision: "[W]e conclude the anti-SLAPP statute was not intended to allow an employer to use a

protected activity as the means to discriminate or retaliate and thereafter capitalize on the subterfuge by bringing an anti-SLAPP motion to strike the complaint. In that case, the conduct giving rise to the claim is discrimination and does not arise from the exercise of free speech or petition." (*Nam*, *supra*, 1 Cal.App.5th at pp. 1190-1191.) The *Nam* court further observed that to ignore the defendant's alleged motive in a harassment, discrimination, or retaliation case "would subject most, if not all, harassment, discrimination, and retaliation cases to motions to strike. Any employer who initiates an investigation of an employee, whether for lawful or unlawful motives, would be at liberty to claim that its conduct was protected and thereby shift the burden of proof to the employee, who, without the benefit of discovery and with the threat of attorney fees looming, would be obligated to demonstrate the likelihood of prevailing on the merits. Such a result is at odds with the purpose of the anti-SLAPP law, which was designed to ferret out meritless lawsuits intended to quell the free exercise of First Amendment rights, not to burden victims of discrimination and retaliation with an earlier and heavier burden of proof than other civil litigants and dissuade the exercise of their right to petition for fear of an onerous attorney fee award." (*Nam*, at p. 1189.)

We agree with the *Nam* court's observation. Discrimination and retaliation claims are rarely, if ever, good candidates for the filing of an anti-SLAPP motion.

Accordingly, we conclude that defendants' alleged retaliatory motive in suspending plaintiff's staff privileges and subjecting him to a lengthy and allegedly abusive peer review proceeding is the basis on which liability is asserted. The alleged liability does not arise from the statements made during those proceedings. The court erred in ruling otherwise.

15

DISPOSITION

The order granting defendants' anti-SLAPP motion is reversed.  Plaintiff shall recover his costs on appeal.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.