Filed 2/1/19

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| GLENN SYMMONDS et al., | B283529 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC620563) |
| v. | |
| EDWARD JOSEPH MAHONEY et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles, Rafael A. Ongkeko, Judge.  Reversed.

Fox Rothschild, Lincoln D. Bandlow, Sadaf Bathaee, Rom Bar-Nissim, and Laurie Baddon for Defendants and Appellants.

Bohm Law Group, Lawrance A. Bohm, Zane E. Hilton, Bradley J. Mancuso, and Brandon P. Ortiz for Plaintiffs and Respondents.

————————————————

Defendants Edward Joseph Mahoney, also known as Eddie Money, and Eddie Money Entertainment, Inc. (collectively, defendants)[1] appeal from the trial court's order denying a special motion to strike under Code of Civil Procedure[2] section 425.16, the anti-SLAPP (Strategic Lawsuit Against Public Participation) statute.

Mahoney is a singer and songwriter who performs in concerts across the country. In 2015 he terminated his drummer, plaintiff and respondent Glenn Symmonds, who subsequently sued defendants for discrimination on the basis of age, disability, and medical condition. Defendants filed an anti-SLAPP motion arguing that Mahoney's decision as to which musicians performed with him was an act in furtherance of the exercise of his constitutional right of free speech in connection with an issue of public interest, and thus protected under section 425.16.

The trial court denied the motion, finding that Symmonds' cause of action arose from defendants' discriminatory conduct, not the decision to terminate him, and thus Symmonds' claim did not implicate Mahoney's free speech rights.

We hold that defendants met their burden to establish that Mahoney's decision to terminate Symmonds was protected conduct. Accordingly, we reverse and remand so the trial court may conduct the second step of the anti-SLAPP analysis and determine whether Symmonds has demonstrated a probability of

[1] The operative pleading in this case alleged that Eddie Money Entertainment, Inc. is wholly owned and controlled by Mahoney and "exists as [Mahoney's] mere alter ego."

[2] Undesignated statutory citations are to the Code of Civil Procedure.

2

prevailing on the merits of his claim.  We deny Symmonds'
requests for attorney fees and sanctions.

## BACKGROUND

### A.    Symmonds' allegations

On May 20, 2016, Symmonds and his coplaintiff,
Tami Landrum, filed their first amended complaint (FAC), the
operative pleading in this case.  The FAC asserted 22 causes of
action; only the first, for discrimination based upon age,
disability, and medical condition in violation of the California
Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900
et seq.), is at issue in this appeal.  We thus limit our summary of
the allegations to those underlying that claim.  The first cause of
action was asserted by Symmonds alone against all defendants;
this appeal does not address any of the causes of action asserted
by Landrum.

The FAC alleged the following:  Mahoney is a "rock-and-
roll" singer and songwriter "best known for the late '70s hits
'Baby Hold On' and 'Two Tickets to Paradise.' "  Mahoney still
"perform[s] at concerts across the country."

Mahoney hired Symmonds in 1974 as part of his band, an
employment relationship that lasted "off and on for
approximately 41 years."  Symmonds performed as a drummer
for Mahoney during live concerts and in studio, and performed
"before shows with [Mahoney's] 'unplugged' band, for which he
received separate compensation."  He also managed and sold
band merchandise, such as t-shirts, compact discs, and posters, at
a booth following performances.

At some point Symmonds injured his back, which made it
difficult to lift heavy boxes.  He was also diagnosed with cancer,

3

and had to wear diapers during his treatment because of urinary incontinence.[3] During concerts Mahoney would joke about Symmonds' condition to the audience, referring to Symmonds as " 'Chemo the Drummer' " (a reference to chemotherapy), and stating that the concert tour was sponsored by " 'Depends,' " which Symmonds alleged is a brand of "diaper used by people with urinary incontinence."

Because of the chemotherapy, Symmonds was "dehydrated, sweaty, and exhausted after shows," and needed time to change out of his "soiled undergarments." Accordingly, "[o]n numerous occasions" he asked Mahoney to allow him to take a short break before working in the merchandise booth. Symmonds alleged that Mahoney never "engage[d] in an interactive process to ascertain ways to reasonably accommodate Mr. Symmonds' disability."

Sometime in 2015 Mahoney laid off the entire band. Months later, Mahoney rehired the band, but not Symmonds. Symmonds believed his age (he was approximately 61 years old, disabilities, and medical condition (i.e., his cancer and back surgery) were "substantial motivating reasons for his termination." Symmonds alleged that the drummer hired to replace him was younger and not disabled, but "less skilled and qualified" than Symmonds.

In the FAC's first cause of action, Symmonds alleged that Mahoney's conduct constituted unlawful discrimination under FEHA. "Specifically, [Mahoney] denied [Symmonds] reasonable

---

[3] The FAC did not allege the dates of the back injury or cancer diagnosis. The original complaint filed in this action, however, alleged that Symmonds received his cancer diagnosis in April 2013, and underwent surgery for his back in January 2014.

accommodations, harassed [Symmonds], and wrongfully terminated [Symmonds] on the basis of his age and disability."

## B.     Defendants' anti-SLAPP motion

On June 29, 2016, defendants filed a special motion to strike Symmonds' first cause of action under section 425.16. Defendants argued that under the First Amendment to the United States Constitution, Mahoney had the right to select whomever he wished to perform music with him, and Symmonds' first cause of action implicated that right. Defendants argued that Symmonds' claim arose in connection with an issue of public interest given the media's and the public's interest in Mahoney and his music. In support, Mahoney submitted a declaration stating that he had written and performed several hit songs, sold millions of records, had more than 300,000 followers on Facebook, and had appeared in a television commercial referencing one of his songs in 2012. Defendants also submitted news articles dated between 2003 and 2016 concerning Mahoney and his music.

Defendants further argued that Symmonds would be unable to produce evidence demonstrating a probability of prevailing on the merits. Defendants asserted that Mahoney's decision to lay off the band was motivated by his desire to perform with his adult children during the summer of 2015. Defendants claimed that Symmonds reacted negatively to that decision by attempting to discredit Mahoney with fans and concert promoters, and Mahoney accordingly chose not to rehire him.

Defendants disputed the allegations of age discrimination, arguing that Mahoney was older than Symmonds and that the band members he rehired after the summer of 2015 were in their 50's. Defendants also disputed the allegations of discrimination

5

based on Symmonds' cancer, arguing that Mahoney made efforts to raise money for Symmonds' cancer treatment and for cancer charities in general. Defendants claimed Mahoney's jokes about "Depends" were a reference to his own age, and pre-dated Symmonds' cancer diagnosis. Defendants asserted that the "Chemo the Drummer" reference was intended as a humorous way to encourage audience members to purchase t-shirts sold by Symmonds reading " 'Beat Cancer Like a Drum.' "

Symmonds opposed defendants' motion, arguing that his first cause of action "ar[ose] from a discriminatory animus towards [Symmonds] that was ongoing long before [Mahoney's] decision regarding who played in his band," and therefore was not subject to section 425.16. Symmonds also disputed defendants' characterization of events and put forth evidence purportedly undercutting Mahoney's explanations for his conduct.

Defendants filed a reply along with a list of 72 objections to Symmonds' declaration in support of his opposition.

## C.     The trial court's ruling

The trial court denied defendants' motion in a written order. The trial court listed the allegations from the FAC pertaining to age and disability discrimination, specifically Mahoney's jokes about "Depends" and "Chemo the Drummer," Mahoney's failure to engage in an interactive process to reasonably accommodate Symmonds' disability, and Mahoney's decision to fire Symmonds. In light of these allegations, the trial court found that Symmonds' first cause of action was "based on [Mahoney's] alleged conduct leading up to the alleged firing of Symmonds, not [Mahoney's] purported decision regarding who plays music in his band."

6

While acknowledging that the first cause of action included allegations pertaining to adverse employment actions such as the termination, the trial court found that the cause of action was "not based on this overarching allegation, but . . . is based upon numerous detailed allegations regarding [Mahoney's] conduct in the years and months preceding his decision to choose other musicians over Symmonds." The trial court cited *Wilson v. Cable News Network, Inc.* (2016) 6 Cal.App.5th 822 (*Wilson*), review granted March 1, 2017, S239686, a decision by another panel in this division, for the proposition that the gravamen of a cause of action for employment discrimination is the " 'allegedly discriminatory and retaliatory conduct against [the plaintiff], not the particular manifestations of the discrimination and retaliation, such as . . . firing him.' "

The trial court, again quoting *Wilson*, concluded that "[w]hile it is arguable . . . that an employer's choice of who is selected to work on a particular show or project in any particular moment in time is an act in furtherance of the employer's constitutionally protected free speech activity, such choice 'does not mean that defendants' alleged discrimination and retaliation against plaintiff . . . was also an act in furtherance of its speech rights.' " (Ellipsis in original.)

Having concluded that Symmonds' first cause of action did not implicate conduct protected under section 425.16, the trial court did not reach the question of Symmonds' probability of prevailing on the merits and did not address defendants' objections to Symmonds' declaration.

Defendants timely appealed.

7

## DISCUSSION

Under the anti-SLAPP statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The statute protects written and oral statements in various contexts, as well as "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Id.*, subd. (e).) Section 425.16 instructs that its provisions "shall be construed broadly." (*Id.*, subd. (a).)

"Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) The defendant's burden "is not an onerous one," requiring only a "prima facie showing that the plaintiff's claims arise from the defendant's constitutionally protected free speech or petition rights" in connection with a public issue or an issue of public interest. (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 112.) " ' "[A] court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis." ' " (*Ibid.*, italics omitted.)

"If the defendant makes the required showing [at the first step], the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success."

8

(*Baral*, *supra*, 1 Cal.5th at p. 384.) " '[I]f the defendant does not meet its burden on the first step, the court should deny the motion and need not address the second step.' " (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 586.)

An anti-SLAPP motion need not be directed at a cause of action in its entirety, but "may be used to attack parts of a count as pleaded." (*Baral*, *supra*, 1 Cal.5th at p. 393.) Thus, when a cause of action is supported by allegations of both protected and unprotected activity, the anti-SLAPP statute applies to the former but does not reach the latter. (*Id.* at p. 382.) "[C]ourts may rule on plaintiffs' specific claims of protected activity," regardless of how they are framed or grouped in the pleading. (*Id.* at p. 393; see *Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1164−1165.)

We review the grant or denial of an anti-SLAPP motion de novo. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) "We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity. [Citations.] In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based." (*Ibid.*)

## A. Untimeliness

Symmonds argues that defendants' special motion to strike was untimely. We reject this argument.

Section 425.16, subdivision (f) states that "[t]he special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." " 'An amended complaint reopens the time to file an anti-SLAPP motion without court permission only if the amended

complaint pleads new causes of action that could not have been the target of a prior anti-SLAPP motion, or adds new allegations that make previously pleaded causes of action subject to an anti-SLAPP motion.' " (*Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2018) 4 Cal.5th 637, 641, 646.)

The original complaint in this action was filed on October 19, 2015, and included causes of action for age and disability discrimination and wrongful termination, similar to the FAC. Symmonds contends that defendants therefore should have brought their anti-SLAPP motion within 60 days of the filing of the original complaint, not the FAC, and the filing in June 2016 was untimely.

The record does not indicate that Symmonds challenged the timeliness of the motion in the trial court, and the trial court did not expressly address the issue. We may assume, however, that the trial court implicitly exercised its discretion to allow filing of the motion despite the expiration of the 60-day deadline. (See 425.16, subd. (f).)[4] To the extent Symmonds believes this was in error, his remedy was to file his own notice of appeal, which he did not do. (*Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 665 [" ' " 'a respondent who has not appealed from the judgment may not urge error on appeal' " ' "].) Even were we to reach the merits, Symmonds presents no argument in his appellate brief that the trial court abused its discretion.

---

[4] A party's request is not a prerequisite to a trial court's exercise of its discretion to hear an otherwise untimely anti-SLAPP motion. (§ 425.16, subd. (f); *Chitsazzadeh v. Kramer & Kaslow* (2011) 199 Cal.App.4th 676, 684.)

**B.      The trial court erred by denying defendants' special motion to strike at the first step of anti-SLAPP analysis**

Again, to prevail at the first step of anti-SLAPP analysis, "the defendant must establish that the challenged claim arises from activity protected by section 425.16." (*Baral, supra*, 1 Cal.5th at p. 384.)  Thus, in reviewing the trial court's denial of defendants' special motion to strike, we must address two questions:  (1) From what activity does Symmonds' first cause of action arise, and (2) is that activity protected by section 425.16?

Defendants argue that the activity underlying the first cause of action was Mahoney's decision to terminate Symmonds, a decision Mahoney contends was in furtherance of his free speech rights in connection with an issue of public interest.  The trial court found, and Symmonds argues on appeal, that the activity underlying the cause of action was Mahoney's discriminatory conduct, not the termination itself, and that conduct was not in furtherance of Mahoney's free speech rights.

For the reasons that follow, we agree with defendants.  We begin with the second question, and explain why Mahoney's decision to terminate Symmonds was protected activity.  We then explain why we conclude that Symmonds' first cause of action arose from that protected activity.

11

1. **Mahoney's decision to terminate Symmonds as drummer was protected conduct under the anti-SLAPP statute**

   a. *Mahoney's selection of musicians to perform with him was an act in furtherance of the exercise of the right of free speech*

"Music, as a form of expression and communication, is protected under the First Amendment." (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 790; see also *McCollum v. CBS, Inc.* (1988) 202 Cal.App.3d 989, 999 ["First Amendment guarantees of freedom of speech and expression extend to all artistic and literary expression," including "music" and "concerts"].) Courts have held that acts that "advance or assist" the creation and performance of artistic works are acts in furtherance of the right of free speech for anti-SLAPP purposes. (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 (*Tamkin*) [writing, casting, and broadcasting popular television show are acts in furtherance of free speech].) A singer's selection of the musicians that play with him both advances and assists the performance of the music, and therefore is an act in furtherance of his exercise of the right of free speech.

Our conclusion is supported by *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510 (*Hunter*), an opinion by our colleagues in Division Seven. In *Hunter*, the plaintiff filed an employment discrimination suit alleging that two television stations owned by the defendant had "refused to hire him as a weather news anchor because of his gender and age." (*Id.* at p. 1513.) The defendant argued that its "selection of a weather anchor . . . qualifies as an act in furtherance of the

12

exercise of free speech," protected under the first prong of section 425.16. (*Id.* at p. 1521.) The court agreed. (*Ibid.*) The court noted that previous cases had recognized that both reporting the news and creating a television show were " 'exercise[s] of free speech.' " (*Ibid.*, alteration in original.) The defendant's selections of weather anchors "were essentially casting decisions regarding who was to report the news on a local television newscast," and therefore " 'helped advance or assist' both forms of First Amendment expression." (*Ibid.*)

Here, selection of a drummer is analogous to a "casting decision[ ]" regarding who is to perform music during a concert or studio performance, and thus is "an act in furtherance of the exercise of free speech." (*Hunter, supra*, 221 Cal.App.4th at p. 1521).

Symmonds cites cases, including *Wilson*, that criticized *Hunter* for ignoring the employer's allegedly discriminatory motive when assessing whether the employer's conduct was protected activity. (See *Nam v. Regents of University of California* (2016) 1 Cal.App.5th 1176, 1188-1189 (*Nam*) [disagreeing with *Hunter*'s conclusion that "the employer's motive to discriminate was irrelevant in determining whether the defendant met its threshold burden to prove the conduct arose from protected activity"]; *Wilson, supra*, 6 Cal.App.5th at pp. 834-835 [same, citing *Nam*]).

In *Nam*, a hospital terminated a medical resident following an investigation and disciplinary proceedings. (*Nam, supra*, 1 Cal.App.5th at pp. 1181-1184.) The resident sued, claiming she was terminated for discriminatory and retaliatory reasons after she rebuffed a more senior doctor's sexual advances and complained about patient care and safety issues. (*Id.* at p. 1184.)

13

The Third District Court of Appeal accepted the defendants' position that the disciplinary proceedings were protected as a "proceeding authorized by law" under the anti-SLAPP statute (*id.* at pp. 1186-1187), but rejected the argument that the discrimination suit was therefore subject to that statute: "[T]he anti-SLAPP statute was not intended to allow an employer to use a protected activity as the means to discriminate or retaliate and thereafter capitalize on the subterfuge by bringing an anti-SLAPP motion to strike the complaint. In that case, the conduct giving rise to the claim is discrimination and does not arise from the exercise of free speech or petition." (*Id.* at pp. 1190-1191.)[5]

In *Wilson*, a television news producer sued the network that formerly employed him and other related corporate defendants, alleging "employment discrimination on the basis of age, race, color, ancestry, and association with a person with a disability."[6] (*Wilson, supra*, 6 Cal.App.5th at pp. 827, 829.) A majority of the appellate panel reversed the trial court's grant of the defendants' anti-SLAPP motion. *(Id.* at p. 827.) The majority acknowledged that "a producer or writer shapes the way in which news is reported. Thus, defendants' choice of who works as a

_____

[5] The Supreme Court's later decision in *Park* clarified that the fact that a termination results from an official proceeding (in that case a tenure review of a university professor) does not make the termination itself a protected act under section 425.16. (*Park, supra*, 2 Cal.5th at pp. 1068-1070.) We observe that had the court in *Nam* had the benefit of our Supreme Court's ruling in *Park*, it may have decided *Nam* in the plaintiff's favor on that basis without addressing the issue of discriminatory motive at all.

[6] The producer claimed that his wife was disabled on the basis of infertility. (*Wilson, supra*, 6 Cal.App.5th at p. 828.)

14

producer or writer is arguably an act in furtherance of defendants' right of free speech." (*Id.* at p. 834.) "But," the majority continued, "this does not mean that defendants' alleged discrimination and retaliation against plaintiff—a long-term, well-reviewed existing employee that CNN had already deemed qualified and acceptable to shape its news reporting—was also an act in furtherance of its speech rights." (*Ibid.*) The majority "reject[ed] defendants' characterization of their allegedly discriminatory and retaliatory conduct as mere 'staffing decisions' in furtherance of their free speech rights to determine who shapes the way they present news. The press has no special immunity from generally applicable laws." (*Id.* at p. 836.)

We respectfully suggest that *Nam* and *Wilson* are in tension with our Supreme Court's decision in *Navellier v. Sletten* (2002) 29 Cal.4th 82, which held that the alleged wrongfulness of a defendant's conduct is an issue for the second step of anti-SLAPP analysis, not the first. In *Navellier*, the plaintiffs alleged that defendant Sletten had breached a release he had signed by filing counterclaims against them in a federal lawsuit. (*Id.* at p. 87.) The plaintiffs and a dissenting justice argued that, because Sletten had waived his right to petition the courts by signing the release, his petitioning was not a " 'valid exercise' " of his First Amendment rights subject to the protections of the anti-SLAPP statute. (*Id.* at p. 94; see *id.* at p. 97 (dis. opn. of Brown, J.).)

The *Navellier* majority rejected this argument. "That the Legislature expressed a concern in the [anti-SLAPP] statute's preamble with lawsuits that chill the valid exercise of First Amendment rights does not mean that a court may read a separate proof-of-validity requirement into the operative sections

15

of the statute. [Citations.] Rather, any 'claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case.' " (*Navellier*, *supra*, 29 Cal.4th at p. 94, final alteration in original.) Challenging the lawfulness of a defendant's conduct at the first step of the analysis " 'confuses the threshold question of whether the SLAPP statute [potentially] applies with the question whether [an opposing plaintiff] has established a probability of success on the merits.' " (*Ibid.*) " 'The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law. If this were the case then the [secondary] inquiry as to whether the plaintiff has established a probability of success would be superfluous.' " (*Id.* at pp. 94-95, alteration in original.)

*Hunter* relied on *Navellier* to reject the plaintiff's argument that his claim was based on the defendant's discriminatory criteria in selecting weather anchors, not the selection decision itself. (*Hunter*, *supra*, 221 Cal.App.4th at pp. 1521-1522.) The court stated that the plaintiff's argument "confuses the conduct underlying [the plaintiff's] claim—[the defendant's] employment decisions—with the purportedly unlawful motive underlying that conduct—employment discrimination." (*Id.* at p. 1522.)

We agree with *Hunter*'s reasoning in light of *Navellier*. To the extent that *Nam* and *Wilson* suggest that a defendant's discriminatory motive negates protections that otherwise would apply to the defendant's conduct under section 425.16, those decisions assessed the " 'claimed illegitimacy of the defendant's

16

acts' " at the first stage of anti-SLAPP analysis, in contravention of *Navellier*. (*Navellier*, *supra*, 29 Cal.4th at p. 94.) We respectfully decline to follow them.

> ### b. *Mahoney's selection of musicians to perform with him was an act in connection with an issue of public interest*

We agree with defendants that Mahoney's selection of a drummer was conduct "in connection with . . . an issue of public interest." (§ 425.16, subd. (e)(4).) Courts have defined "an issue of public interest" broadly as " 'any issue in which the public is interested.' " (*Tamkin*, *supra*, 193 Cal.App.4th at p. 143, italics omitted.) " '[T]he issue need not be "significant" to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest.' " (*Ibid*.)

*Tamkin* concluded that "the creation and broadcasting" of a television show was "an issue of public interest" as demonstrated "by the posting of the casting synopses [for the episode] on various Web sites and the ratings for the episode" (*Tamkin*, *supra*, 193 Cal.App4th at p. 143), which indicated it was "the most watched show that night" (*id.* at p. 138). In *Daniel v. Wayans* (2017) 8 Cal.App.5th 367 (*Daniel*), review granted May 10, 2017, S240704,[7] this court held that the creation of a comedy film was an issue of public interest given "[t]he longevity and breadth" of the starring actor and co-writer's career, as demonstrated by the many television shows and films in which he had acted or had written. (*Id.* at p. 386.)

---

[7] The Supreme Court deferred further action in *Daniel* pending resolution of the *Wilson* appeal. (See 7/12/2017 docket entry, S240704.)

17

Here, defendants have made a prima facie showing sufficient to establish that Mahoney's music and concerts were of interest to the public. Mahoney's declaration put forth evidence that he had sold millions of records and had hundreds of thousands of people following him on social media. Defendants also submitted news articles from different media outlets dated as recently as 2016 discussing Mahoney and his music, including the concert tour in which Mahoney performed with his children and from which he excluded Symmonds. Moreover, the FAC itself alleged that Mahoney "continue[d] to perform at concerts across the country," indicating that Mahoney's music and performances were of interest to the public.

In sum, we conclude that Mahoney's decision to terminate Symmonds and replace him with another drummer constituted protected conduct for purposes of the first step of anti-SLAPP analysis.

Symmonds notes that he was not only Mahoney's drummer, but also worked for him as merchandise manager and a pre-show performer. Symmonds contends that "[i]n no way would these other jobs be considered 'protected speech.' " Symmonds' loss of those additional positions, however, stemmed from the decision to terminate him as drummer; Symmonds does not allege that Mahoney made separate decisions as to each position, just that Mahoney laid Symmonds off with the rest of the band and then declined to rehire him. In other words, Symmonds' termination as merchandise manager and pre-show performer was derivative of, and inseparable from, the decision to terminate him as drummer. Thus, even if some of Symmonds' work for Mahoney had no connection to Mahoney's free speech rights (an issue we do not decide), it does not affect our conclusion that the decision

18

to terminate Symmonds implicated those rights for anti-SLAPP purposes.

### 2. Symmonds' first cause of action arose from Mahoney's decision to terminate him

We further conclude that Symmonds' first cause of action arose from Mahoney's decision to terminate him.  "A claim arises from protected activity when that activity underlies or forms the basis for the claim."  (*Park*, *supra*, 2 Cal.5th at p. 1062.)  "Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' "  (*Id.* at p. 1063.)  "[I]n ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability."  (*Ibid.*)  If "specific elements" of a plaintiff's claims "depend[ ] upon the defendant's protected activity," those claims arise from that protected activity.  (See *id.* at p. 1064.)

Symmonds' employment discrimination claim required him to prove the following elements: " '(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.' "  (*Park*, *supra*, 2 Cal.5th at pp. 1067-1068).  Here, the allegation that Mahoney fired Symmonds supplied the third element, the " 'adverse employment action, such as termination.' "  (*Id.* at p. 1067.)  As we have discussed, the termination was conduct in furtherance of the First Amendment; thus, under the analysis outlined in *Park*,

19

Symmonds' claim arose from that protected conduct because the conduct supplied one of the elements of the claim.

The trial court, relying on *Wilson*, reached the opposite conclusion, finding that Symmonds' claim was not based on the termination, but on Mahoney's allegedly discriminatory conduct preceding the termination. *Wilson*'s reasoning, however, conflicts with the Supreme Court's later decision in *Park*. *Wilson* held that "the gravamen of plaintiff's employment-related causes of action was defendants' allegedly discriminatory and retaliatory conduct against him, not the particular manifestations of the discrimination and retaliation, such as denying promotions, assigning him menial tasks, and firing him." (*Wilson*, *supra*, 6 Cal.App.5th at p. 836.) The *Wilson* majority reasoned that "firing, failure to promote, demotion, etc." of an at-will employee do not constitute actionable breaches of duty, and therefore the news producer's claim necessarily was based not on the adverse employment actions, but on the discrimination and retaliation underlying them: "Absent these 'motivations,' plaintiff's employment-related claims would not state a cause of action." (*Id.* at p. 835.) Thus, "[d]iscrimination and retaliation are not simply motivations for defendants' conduct, they *are* defendants' conduct." (*Ibid.*)

The *Wilson* majority was correct that the plaintiff news producer's cause of action depended on his allegations of discrimination and could not stand in their absence. A plaintiff asserting employment discrimination, however, must *also* allege an adverse employment action. (*Park*, *supra*, 2 Cal.5th at pp. 1067-1068.) To the extent that adverse employment action is an act in furtherance of the employer's free speech rights in connection with an issue of public interest, therefore, under *Park*

20

the employment discrimination claim necessarily arises from protected conduct. The discrimination cannot be considered separately from the adverse employment action for anti-SLAPP purposes, as the *Wilson* majority did.

In defense of the trial court's ruling, Symmonds also cites *Bonni v. St. Joseph Health System* (2017) 13 Cal.App.5th 851 (*Bonni*), review granted November 1, 2017, S244148, a decision by the Fourth District Court of Appeal involving a surgeon's claim of whistleblower retaliation. (*Id.* at p. 854.) Similar to *Wilson*, *Bonni* held that the suit was not subject to the anti-SLAPP statute because "the *basis* for a [whistleblower] retaliation claim . . . is the retaliatory purpose or motive for the adverse action, not the adverse action itself." (*Bonni*, at p. 861.) Again, in light of *Park* we cannot agree that an employment discrimination claim does not arise from the adverse employment action when that action is a necessary element of the cause of action.

In so concluding we do not suggest that employment decisions as a general matter are acts in furtherance of the right to petition or free speech for anti-SLAPP purposes. For example, in *Park*, the Supreme Court first rejected the argument that a university's tenure decision was protected because the process that led to it was communicative. (*Park*, *supra*, 2 Cal.5th at pp. 1068-1070.) The court also rejected the university's argument, based on *Hunter*, that the tenure decision itself "implicate[d] the public interest as much as decisions concerning who should appear in a news broadcast and thus are equally entitled to protection." (*Park*, at p. 1071.) The court called this a "mismatched analogy" because, unlike the defendant in *Hunter*, the university had failed to "explain how the choice of faculty

21

involved conduct in furtherance of *University speech* on an identifiable matter of public interest. . . . It has not explained what University expression on matters of public interest the retention or nonretention of this faculty member might further." (*Park*, at p. 1072.) *Park* illustrates that, irrespective of motive, a cause of action based on an adverse employment decision is not subject to the anti-SLAPP statute unless the decision itself implicates rights protected under section 425.16.[8]

Here, as we have explained, Mahoney's decision to terminate Symmonds or, put another way, not to have Symmonds perform music with him, did implicate Mahoney's free speech rights. Thus, this case, unlike *Park*, presents a circumstance in which the adverse employment action itself is conduct within the purview of the anti-SLAPP statute. (See *Rall v. Tribune 365 LLC* (Jan. 17, 2019, B284566) __ Cal.App.5th __ [2019 Cal.App.Lexis 52 *31-33] [blogger's wrongful termination claim against newspaper arose from newspaper's protected activity of choosing not to publish blogger's work].) The trial court erred in finding that defendants had not met their burden at the first step of anti-SLAPP analysis.

As Justice Chin stated in his concurrence in *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, a sexual harassment case brought by a writer's assistant on a popular television program, "[b]alancing the compelling need to protect employees from sexual harassment with free speech rights can, in

---

[8] The Court in *Park* declined to express an opinion as to whether *Hunter* was correctly decided, concluding only that the university had failed to present an argument analogous to that accepted by the court in *Hunter*. (*Park, supra,* 2 Cal.5th at p. 1072.)

22

some contexts, present very difficult questions." (*Id.* at p. 296 (conc. opn. of Chin, J.).)  The same can be said for cases like this one, in which antidiscrimination protections run up against an employer's free speech rights.  As *Hunter*, *Nam*, *Wilson*, and *Bonni* demonstrate, reasonable minds may differ on the proper resolution.  The Supreme Court has granted review in both *Wilson* and *Bonni*, so further guidance may be forthcoming. Until the Supreme Court speaks definitively, however, we are bound by *Navellier* and *Park*, which mandate that we reverse the trial court.

## C. On remand, the trial court should determine whether Symmonds has demonstrated a probability of prevailing on the merits of his claim

As for the second step of the anti-SLAPP analysis, defendants argue that Symmonds cannot show a probability of prevailing on the merits of his claim because Symmonds has failed to put forth admissible evidence establishing that Mahoney terminated him for discriminatory reasons.  Defendants also point to their own evidence submitted in support of their anti-SLAPP motion, which they claim establishes that Mahoney terminated Symmonds for legitimate reasons.  Symmonds argues that he put forth sufficient evidence to meet his prima facie burden.

Because the trial court denied defendants' anti-SLAPP motion at the first step of the analysis, it did not address whether Symmonds met his burden under the second step, nor did it rule on defendants' objections or the admissibility of the parties' evidence.  Under similar circumstances, the court in *Hunter* held "the more prudent course is to remand the matter to the trial court" to conduct the second step analysis in the first instance.

(*Hunter*, *supra*, 221 Cal.App.4th at p. 1527.) We follow that course here.

## D. Defendants do not challenge the trial court's findings as to the other allegations of misconduct underlying the first cause of action

As the trial court correctly noted, and Symmonds reiterates on appeal, Symmonds' first cause of action was not based solely on his termination, but also on allegations of harassment and failure to accommodate Symmonds' disability. Defendants did not direct their anti-SLAPP motion at those additional allegations. (See *Baral*, *supra*, 1 Cal.5th at p. 393 [anti-SLAPP motion "may be used to attack *parts* of a count as pleaded"], italics added.) On appeal, defendants characterize those allegations as "conduct . . . prior to the adverse employment action," that is, the termination. (Italics and boldface omitted.) Both harassment and failure to accommodate a disability, however, constitute unlawful employment practices in their own right. (See Gov. Code, § 12940, subd. (j)(1) [unlawful to harass an employee on basis of, among other things, age, disability, and medical condition]; *id.*, subd. (m)(1) [unlawful to fail to make reasonable accommodation for an employee's known disability].) Defendants make no argument on appeal, nor did they in the trial court, that those independent claims implicate rights protected under section 425.16; indeed, in their reply in support of the special motion to strike, they characterized the allegations of conduct prior to the firing as "unprotected activity" for anti-SLAPP purposes.

Given the absence of any argument from defendants that the allegations of harassment and failure to accommodate a disability implicate protected activity, on remand the trial court

24

should disregard those allegations when conducting its anti-SLAPP analysis, except insofar as they may be pertinent to assessing the probability of Symmonds' prevailing on his claim that Mahoney terminated him for unlawfully discriminatory reasons.  (See *Baral*, *supra*, 1 Cal.5th at p. 396.)  We express no opinion as to whether those allegations would be subject to the anti-SLAPP statute had defendants so argued, nor do we express an opinion as to whether they are sufficient to plead a cause of action.

### E.   Symmonds' request for sanctions is procedurally defective and lacks merit

Symmonds requests that we "make an affirmative determination" that defendants' special motion to strike "was frivolous or undertaken solely to cause unnecessary delay," thus entitling Symmonds to costs and reasonable attorney fees under section 425.16, subdivision (c)(1).  Symmonds cites no authority for the proposition that an appellate court may make that determination in the first instance.  The trial court may make such a determination, if appropriate, upon remand.

Symmonds also requests that we impose sanctions on defendants for filing their appeal, which he asserts was "frivolous" and "solely for the purpose of causing delay."  Symmonds' request is procedurally improper.  Under California Rules of Court, rule 8.276(b)(1), a request for sanctions on appeal must be raised in a separate motion; "[s]anctions cannot be sought in the respondent's brief."  (*Cowan v. Krayzman* (2011) 196 Cal.App.4th 907, 919.)  Symmonds also has failed to "include a declaration supporting the amount of any monetary sanction sought."  (Cal. Rules of Court, rule 8.276(b)(1).)  Regardless, defendants' appeal clearly has merit given our

25

reversal of the trial court's order.  Symmonds' request for sanctions is denied.

## DISPOSITION

The trial court's order denying defendants' special motion to strike is reversed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.  Defendants are awarded their costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>


BENDIX, J.


We concur:


ROTHSCHILD, P. J.


JOHNSON, J.