Filed 8/12/22  The One Experience v. Loomstein CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE ONE EXPERIENCE, LLC,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>DAVID LOOMSTEIN,<br><br>     Defendant and Respondent. | B309857<br><br>Los Angeles County<br>Super. Ct. No.<br>20SMCV00478 |

APPEAL from an order of the Superior Court of Los Angeles County, Elaine W. Mandel, Judge.  Reversed.

Burgee & Abramoff and John G. Burgee for Plaintiff and Appellant.

The Kernan Law Firm, S. Michael Kernan and R. Paul Katrinak for Defendant and Respondent.

Plaintiff The One Experience, LLC appeals an order granting Defendant David Loomstein's special motion to strike under California's anti-strategic lawsuit against public participation (anti-SLAPP) statute (Code Civ. Proc., § 425.16).[1] The lawsuit alleged defendant interfered with a contract to fund a public music festival by making disparaging remarks about plaintiff's managing member to the festival's chief financial backer, resulting in the investor repudiating his agreement to provide $350,000 in financing. Based on the context in which the allegedly defamatory statements were made—in private text messages to the festival's sole investor amid a contract dispute with plaintiff's managing member—we conclude plaintiff's claims do not arise from conduct in furtherance of defendant's right of free speech on a public issue. We reverse.

**FACTS AND PROCEDURAL BACKGROUND**

We summarize the relevant facts in the light most favorable to plaintiff, the party opposing the anti-SLAPP motion. (*Murray v. Tran* (2020) 55 Cal.App.5th 10, 16 (*Murray*), citing *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).)

**1.    *Background***

Plaintiff produces an annual arts and music festival marketed as the One Love Festival (the Festival). The company's managing member is Kenneth Schwenker.

In 2017, plaintiff hired defendant as the controller and manager of community sales for the Festival. Defendant

---

[1]    Statutory references are to the Code of Civil Procedure unless otherwise designated.

understood his primary responsibility was to keep the Festival on budget; however, according to defendant, Schwenker "did not adhere to the original deal" and limited defendant's job to only community sales. The Festival lost approximately $260,000 that year, and many of the performers were not paid for their services.

Defendant was apprehensive about working with plaintiff or Schwenker again after the 2017 Festival. However, a mutual friend told him that Schwenker had been misled by his previous business partners, and that Schwenker needed defendant's help with the business and creative aspects of the next year's Festival.

In May 2018, plaintiff hired defendant as the "Music Director" for the 2018 Festival. While defendant contends he was also hired as "lineup curator, contract administrator, affiliate sales director, and manager of the 2017 back payouts," Schwenker disputed that there was any agreement to give defendant " 'curation and control' " of the Festival's lineup.

The same month, defendant met Lee Pearson who, along with another individual, would be financing the 2018 Festival. After their meeting, Pearson sent a text message to defendant, observing the "curation" needed defendant's "insight." Defendant replied, proposing to "run a few names by [Pearson]."

On June 9, 2018, Schwenker, on plaintiff's behalf, signed an agreement with Pearson, under which Pearson's company agreed to provide $350,000 of financing for the Festival. The funding contract granted Pearson the authority to approve the Festival's final budget and the names of the proposed headliner artist and two sub-headliner artists. It also required plaintiff to consult with Pearson regarding "all aspects of the management and production" of the Festival.

3

On June 15, 2018, defendant emailed Schwenker with several business questions regarding the Festival. At the time, defendant says, he "was still under the impression that [he] was the music director, affiliate sales director, and . . . responsible for the payouts of the artists from the 2017 Festival." However, according to defendant, "Schwenker continued to delegate [defendant's] responsibilities to others, or [to] solicit others['] opinions on potential performers for the Festival." After speaking with Schwenker, defendant sent a text message to Pearson, writing, "When you have a moment, I'd like to take a moment and discuss your impressions of my roles and responsibilities for the show. I just spoke with [Schwenker] and I'm completely unclear at this moment."

On June 19, 2018, defendant emailed Schwenker a written contract, proposing to fix defendant's duties as "Producer" of the Festival. The proposed contract would make defendant the senior talent broker and programming director, with responsibility for booking talent and "developing and finalizing set times and lineups on all music stages at the Festival." Defendant would also have responsibility "to manage [the] process of paying out artists owed additional money from the [2017 Festival]."

Schwenker rejected defendant's proposed contract. He reiterated that he—not defendant—was to have "final say on the talent" and that he and Pearson were to mutually agree on the first and second tier headliners under the funding contract.

After receiving Schwenker's response, defendant sent a text message to Pearson, explaining that he and Schwenker were "very far from where we were when this conversation began." Pearson replied that Schwenker's response was "disconcerting

4

for [him]." He later sent a text message to defendant explaining that he had spoken to Schwenker and that Schwenker was "going to man up and manage the situation." Pearson said he planned to meet with Schwenker the next day, June 22, 2018, and offered to give defendant a ride. Defendant replied that he would be at the meeting.

On June 22, 2018, defendant met with Schwenker and three other people involved in the Festival's production. Pearson was not able to attend the meeting. According to defendant, he learned that the meeting attendees had already spent a week planning the Festival without him, at which point, it became "clear" to defendant that "Schwenker was fully backtracking on [their] agreement, and was poorly planning the Festival, just as he did the year before." Defendant admitted he "became upset, and vocalized [his] disagreement with the way things were being conducted." According to Schwenker, defendant made "derogatory statements about [Schwenker] and [his] handling or management" of the Festival at the meeting.

Later that day, Schwenker learned from Pearson that defendant had also made "derogatory statements" about Schwenker to Pearson following the meeting. According to Schwenker, Pearson then informed Schwenker that he was suspending his performance on the funding contract because of defendant's derogatory statements.

## 2. *The Complaint*

Plaintiff sued defendant asserting four causes of action for (1) intentional interference with contractual relations; (2) intentional interference with prospective economic advantage; (3) negligent interference with prospective economic advantage; and (4) inducing breach of contract. The complaint alleges

5

defendant made "statements about SCHWENKER that were false, inflammatory, and ha[d] a natural tendency to injure the Plaintiff's reputation" at a "creative team meeting" on June 22, 2018, including that Schwenker "is an idiot with no idea of what he is doing"; that "everything [SCHWENKER] does is wrong"; and that it was "stupid" to "creatively work[ ] on the festival . . . because [SCHWENKER] is an idiot." After the meeting, defendant allegedly repeated the "false and inflammatory statements" to Pearson. On June 26, 2018, as a direct and proximate result of defendant's statements, Pearson allegedly repudiated the funding contract by reducing his commitment from $350,000 to $125,000.

3. *The Special Motion to Strike and Evidence*

Defendant moved to strike each cause of action under the anti-SLAPP statute, asserting all claims arose from "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) He argued the claims "plainly arose from a protected activity because '[m]usic, as a form of expression and communication, is protected under the First Amendment' " and he was sued for conduct associated with "curating artists for the Festival." Defendant emphasized his "alleged statements were made at [a] meeting with other creatives and producers of the Festival, and if repeated, . . . would have been repeated to a financer of the Festival." As for plaintiff's probability of prevailing on the claims, defendant argued the statements were opinions that would not support a claim for defamation; there was no evidence the statements were false; there was no evidence

6

defendant intended to interfere with the funding contract; and there was no evidence his conduct was "wrongful."

Defendant offered a supporting declaration with his special motion to strike. In addition to recounting his version of the underlying facts, defendant's declaration authenticated a series of private text messages he and Pearson exchanged between May 23, 2018 and June 26, 2018—the date Pearson allegedly repudiated the funding contract with plaintiff.

In opposition, plaintiff disputed that its claims arose from protected activity. While it acknowledged a concert promoter's conduct generally qualified for protection, plaintiff maintained defendant was never contracted to promote the Festival and he never had "final say on who performs." Rather, plaintiff argued, defendant made the offending "derogatory remarks to the Festival investor in an attempt to obtain more control over the Festival."

In his supporting declaration, plaintiff's managing member, Schwenker, explained it was "only after the filing of [the] complaint" and through defendant's declaration that he became aware of defendant's private text messages to Pearson. Schwenker highlighted several text messages defendant sent to Pearson in the days preceding the repudiation of the funding contract, including messages in which defendant claimed Schwenker had been "misleading" Pearson "partly because he's clueless [and] partly because he lacks integrity"; Schwenker had "no idea what his lying and misrepresenting [was] causing [defendant] and a ton of other people who [were] being very badly impacted by his malpractice"; it was "not in [Schwenker's] character" to "do the right thing"; and Pearson "might need to let [Schwenker] know that if this doesn't get resolved there won't

7

be a show this year, and he is on the hook for fraudulently representing his entity to [Pearson]."

Plaintiff argued these private text messages showed defendant interfered with the funding contract by misleading Pearson to believe Schwenker "misrepresented sales figures." And, by making "degrading comments about [Schwenker's] commercial and professional integrity," plaintiff argued defendant "led the investor to breach the contract."

In his reply brief, defendant asserted—for the first time—plaintiff could not prevail on its claims because the company failed to present evidence of damages. Emphasizing that the funding contract with Pearson was structured as a loan, defendant argued plaintiff could not claim damages for money it was required to repay. Additionally, because the contract set forth a number of preconditions to Pearson's obligation to fully fund the loan, defendant argued plaintiff could not prevail without presenting evidence those preconditions were satisfied.

## 4.   *The Trial Court's Ruling*

In advance of the hearing on defendant's special motion to strike, the trial court issued a tentative ruling denying the motion, concluding plaintiff's claims arose from protected activity, but plaintiff's evidence was sufficient to establish a likelihood of success on the merits. The court reasoned defendant's "title 'music director' implies he helped determine the artistic content and assist with production" and, because his "statements were made at a creative team meeting, relating to the competence of one of the festival's chief organizers," defendant's conduct "to 'advance or assist' the festival qualifie[d] as protected activity." However, with respect to plaintiff's likelihood of success, the court found Schwenker's declaration

8

was sufficient to prove defendant knew of the funding contract, "knew his statements would cause Pearson to withdraw his funding," and "intended his statements to have that effect."

At the hearing, defendant persuaded the trial court to reconsider its ruling on the second prong. Revisiting the argument raised in his reply, defendant asserted plaintiff could not establish damages simply by showing Pearson lent it less money and plaintiff had presented no evidence that the Festival would have made more money had the loan been fully funded. Plaintiff acknowledged Schwenker's declaration had not addressed the profits plaintiff lost as a result of defendant's alleged interference and requested the court grant a continuance to allow Schwenker to submit a supplemental declaration regarding damages. The trial court granted the request and continued the hearing.

After receiving and considering Schwenker's supplemental declaration, the court granted defendant's special motion to strike all causes of action, concluding plaintiff's evidence of lost potential profits was "speculative" and insufficient to support a claim for damages. After moving to vacate the ruling, plaintiff filed a timely notice of appeal.

## DISCUSSION

### 1. *The Anti-SLAPP Analysis and Standard of Review*

The anti-SLAPP statute, section 425.16, establishes a procedure for expeditiously resolving "nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235.) "When served with a SLAPP suit, the defendant may immediately move to strike the complaint under section 425.16.

9

To determine whether this motion should be granted, the trial court must engage in a two-step process." (*Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1543; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).)

The first prong of the anti-SLAPP analysis requires the court to decide "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Equilon, supra,* 29 Cal.4th at p. 67; § 425.16, subd. (b)(1).)  "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.  [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*).)  Thus, the court must consider the elements of a claim and determine what actions supply those elements and consequently form the basis for the defendant's alleged liability. (*Park, supra,* 2 Cal.5th at p. 1063.)  Allegations of protected activity that are " 'merely incidental' or 'collateral' " or that "merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 394.)  "In deciding whether the 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*City of Cotati,* at p. 79, quoting § 425.16, subd. (b).)

10

Section 425.16, subdivision (e), describes four categories of conduct that constitute protected activity. Defendant moved to strike each of plaintiff's claims under section 425.16, subdivision (e)(4), which defines protected activity to include "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Commonly referred to as the "catchall provision," this subdivision "extends the protection of the anti-SLAPP statute beyond actual instances of free speech to all conduct in furtherance of the exercise of that right when undertaken in connection with a public issue or issue of public interest." (*Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1036 (*Ojjeh*); *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 139–140 (*FilmOn*).)

If the court finds the defendant has made the threshold showing, the analysis proceeds to the second prong, under which the court "determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon, supra,* 29 Cal.4th at p. 67; § 425.16, subd. (b)(1).) To establish the requisite probability of prevailing, the plaintiff need only have " 'stated and substantiated a legally sufficient claim.' " (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123.)

We independently review the trial court's ruling on an anti-SLAPP motion under the de novo standard. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject

11

to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).)

**2.      *Defendant's Alleged Liability Does Not Arise from Conduct in Furtherance of the Constitutional Right of Petition or Free Speech***

The anti-SLAPP statute's catchall provision protects "any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subdivision (e)(4).) In *FilmOn*, our Supreme Court clarified that "a statement is made 'in connection with' a public issue when it contributes to— that is, 'participat[es]' in or furthers—some public conversation on the issue." (*FilmOn, supra,* 7 Cal.5th at p. 151.) To determine whether a statement contributes to a public conversation on a public issue, "a court must consider the context as well as the content of a statement." (*Id.* at p. 149.) "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*Id.* at pp. 149–150.) "[T]he inquiry of whether a statement contributes to the public debate is one a court can hardly undertake without incorporating considerations of context—including audience, speaker, and purpose." (*Id.* at pp. 151–152.)

Before we can assess whether the content and context of defendant's conduct contributes to a public conversation on a public issue, we must first identify the conduct that each cause of action is based upon. (*City of Cotati, supra,* 29 Cal.4th at

p. 78.)  To do this, we begin with the elements of each claim and determine what conduct supplies those elements and consequently forms the basis for defendant's alleged liability. (*Park, supra,* 2 Cal.5th at p. 1063.)  In conducting this analysis, "[w]e do not . . . weigh the evidence, but accept the plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law."  (*Id.* at p. 1067.)

The complaint asserts four causes of action:  intentional interference with contract; intentional interference with prospective economic advantage; negligent interference with prospective economic advantage; and inducing breach of contract.  The first three claims require an act by the defendant (intentional or negligent) to disrupt the plaintiff's contractual or economic relationship with another party; an actual disruption of the relationship; and economic harm proximately caused by the defendant's alleged act. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126; *Venhaus v. Shultz* (2007) 155 Cal.App.4th 1072, 1078.)  The fourth claim for inducing breach of contract has essentially the same elements as intentional interference with contact but requires an alleged intent to induce a breach of a valid contract.  (*Bledsoe v. Watson* (1973) 30 Cal.App.3d 105, 108; see *Winchester Mystery House, LLC v. Global Asylum, Inc.* (2012) 210 Cal.App.4th 579, 596.) For all claims, the disruptive conduct must be "independently unlawful, that is, 'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' " (*Winchester Mystery House,* at p. 596; *Bledsoe,* at p. 108 [to plead a cause of action for inducing breach of contract, plaintiff must allege "defendant's unjustifiable or wrongful conduct"].)

13

The complaint alleges defendant knew of a funding contract between plaintiff and its chief financial backer, Lee Pearson, and defendant made "slanderous and derogatory" statements about plaintiff's managing member, Kenneth Schwenker, to Pearson following a creative team meeting on June 22, 2018. These statements allegedly caused Pearson to repudiate the contract on June 26, 2018 by reducing his funding commitment from $350,000 to $125,000.

In a declaration supporting his special motion to strike, defendant disclosed a series of private text messages he sent to Pearson in the days preceding the investor's alleged repudiation of the funding contract. Plaintiff maintains these text messages reveal the specific conduct by which defendant disrupted plaintiff's contractual and economic relationship with Pearson.[2]

---

[2] In paragraph 11 of the complaint, plaintiff identified two statements that defendant allegedly made about Schwenker at the creative team meeting and repeated to Pearson: (a) "Referring to SCHWENKER, 'he is an idiot with no idea of what he is doing,' 'wasted my time for coming to the meeting as everything [SCHWENKER] does is wrong.' "; and (b) " 'The fact that you are creatively working on the festival is stupid because [SCHWENKER] is an idiot.' " At the initial hearing on defendant's anti-SLAPP motion, plaintiff stipulated to striking these statements from the complaint, explaining that the evidence submitted with defendant's special motion to strike, as recounted in Schwenker's declaration supporting plaintiff's opposition, disclosed the actual "false statements" that gave rise to defendant's alleged liability. In accordance with counsel's stipulation, the court granted the special motion to strike the statements made in paragraph 11 of the complaint. Plaintiff does not challenge that ruling on appeal. Thus, our review is limited

14

Defendant grants that these text messages must be the conduct upon which each claim is based. The parties disagree, however, about which text messages we should consider in assessing whether plaintiff's claims arise from protected activity.

Defendant maintains the preparation of a public music festival is an issue of public interest. (See *Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1106 [" 'selection of a [musician] is . . . an act in furtherance of the exercise of free speech' "]; see also *Cinevision Corp. v. Burbank* (9th Cir. 1984) 745 F.2d 560, 568 [music concert production and promotion is protected expression, recognizing "a concert promoter, like a bookseller or theater owner, is a type of 'clearinghouse' for expression"].) He contends the content of his text messages implicated that issue because he primarily criticized Schwenker's competence to run such a festival and to select the bands that would perform at it. To prove his point, defendant highlights messages he sent Pearson

---

to whether the court properly granted the special motion to strike each cause of action based on the text messages disclosed in defendant's declaration. (See *Murray, supra,* 55 Cal.App.5th at p. 25 [in determining whether the moving party has made a prima facie showing that a claim arose from protected activity, "we start with the pleadings and also consider the evidentiary submissions"]; *City of Cotati, supra,* 29 Cal.4th at p. 79; *Navellier, supra,* 29 Cal.4th at p. 90 [examining "relevant documents" to determine whether acts complained of fall within language of anti-SLAPP statute]; *Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 408 [court is "not limited to examining the allegations of the complaint alone but rather considers the pleadings and the factual material submitted in connection with the special motion to strike"]; *Karnazes v. Ares* (2016) 244 Cal.App.4th 344, 353 [considering pleadings plus declaration and e-mails for step one].)

that, he says, express his overriding concern for "the artists and the public's experience," including statements that Schwenker " 'has no feel for the music, the business, or the community,' " and that Schwenker " 'is utterly clueless about the stakes in all of this,' " as " '[h]e places ZERO value in the community.' " Above all, defendant emphasizes the following text message, which he says provides "the most plain example" that plaintiff's claims are based upon statements defendant made regarding production of the Festival and the selection of bands:

> " 'Yes, curating a show is an art AND a science. But you can tell when picks are totally self-indulgent. They are doing exactly what happened last year, which they hated. Personal favorites only they know and like. Plus some names that will totally turn off music aficionados. And even though any big name will carry a certain amount of weight, if you put them in a setting beyond initiating a commitment to drive thirty minutes, park, and attend a three hour show, the equation totally changes.' "[3]

Plaintiff acknowledges the public has an interest in music festivals but argues defendant's supposed focus on band selection is "wholly contrived," and "totally ignores" statements defendant

---

[3]  We note defendant sent this text message to Pearson on June 26, 2018, after Pearson sent a message to defendant disclosing he had decided "the investment would need to drop to 105k"—in other words, apparently *after* the alleged harm had occurred.

16

made in his private text exchange with Pearson that "accuse Schwenker of defrauding the investor." Plaintiff argues private text messages about the business practices and integrity of a festival promoter's managing member do not bear on the public's interest in music festivals and do not contribute to the public discourse at the core of that interest.

As our Supreme Court recognized in *FilmOn,* while "[m]ost often, courts strive to discern what the challenged speech is really 'about'—a narrow, largely private dispute, for example, or the asserted issue of public interest," this "focus on discerning a single topic of speech is less than satisfying" because "speech is rarely 'about' any single issue." (*FilmOn, supra,* 7 Cal.5th at p. 149.) Indeed, because the content of any given statement or collection of statements is often susceptible of various interpretations, it is "virtually always" the case that "defendants succeed in drawing a line—however tenuous—connecting their speech to an abstract issue of public interest." (*Id.* at p. 150.) "But the catchall provision demands 'some degree of closeness' between the challenged statements and the asserted public interest." (*Ibid.*) Thus, a narrow focus on the content of the relevant speech is insufficient; we must also examine "the specific nature of defendant's speech and its relationship to the matters of public interest." (*Id.* at p. 152.) To do this, we need to look at "the broader context" in which the speech is made, "discerning through that context whether [defendant's] conduct qualifies for statutory protection by furthering the public conversation on an issue of public interest." (*Id.* at p. 153.)

The context of defendant's text exchange with Pearson convinces us that defendant has not been sued for conduct that furthered the public conversation on musical performances,

17

the festival experience, or any other matter that makes a music festival an issue of public interest. (See *FilmOn, supra,* 7 Cal.5th at pp. 150–151.) As defendant's declaration, Schwenker's declaration, and the series of text messages all confirm, shortly after defendant met Pearson and learned of the funding contract, he became embroiled in a dispute with Schwenker over the scope of his work and what defendant saw as Schwenker "delegat[ing] [defendant's] responsibilities to others." The dispute came to an apparent head when Schwenker rejected a written contract defendant proposed that would have made defendant the senior talent booker and programming director for the Festival, with authority over booking talent and establishing the lineup for musical acts. The evidence shows defendant believed Pearson, through the funding contract, had influence over Schwenker, and defendant anticipated Pearson would attend the creative team meeting on June 22, 2018 to support defendant's expanded role in producing the Festival. When Pearson missed the meeting, defendant "unloaded on [Schwenker]," then began sending text messages to Pearson attacking not only Schwenker's management competency, but also his character, integrity, and honesty. This is the relevant context for evaluating the contents of defendant's private text exchange with plaintiff's chief financial backer.

In his text messages to Pearson on June 23, 2018, following the creative team meeting, defendant complained there was "a huge gap between the role I was promised and [Schwenker's] management of the situation." In response to Pearson's suggestion that defendant seemingly had "so much angst about the situation," defendant wrote, "I'm not at all certain I can trust anything out of [Schwenker's] mouth"; "he is not at all

18

forthcoming when it comes to written agreements"; "[Schwenker] is completely spineless"; and "when [Schwenker] is confronted with his lies and bullshit, he starts making excuses and accusations." Defendant concluded the message warning Pearson: "As I see it, you've got a bunch of major problems here, including not just expectations on my part, but the actual agreements and assurances that were being made with me and subsequently broken. . . . [A]greements need to be made and kept. You guys need to approach the situation through the requirement of agreement and integrity[,] [b]ecause I am experiencing the pain of the lack thereof on this show."

In another string of text messages the same day, after complaining that the attendees at the creative team meeting had asserted the "entire experience" would be "curated by them," defendant returned to his attacks on Schwenker's honesty in relation to defendant's role in the Festival and agreements in general, asserting, "[Schwenker] is reneging on every offer at this point[,] knowing I won't stand for [it]." And, again, defendant issued a warning to Pearson about the funding contract and Schwenker's fidelity to its terms: "[Schwenker] is trying to get the maximum amount of money from you for the minimum amount of input and control." "[He] wants you to have the least influence possible. You not attending that meeting yesterday was a god-send to [Schwenker]. And the end of me."

On June 23, 2018, defendant connected his most pointed attacks on Schwenker's character to the financial aspects of the Festival and "previous investor liability" from the earlier festival Schwenker produced. He warned Pearson: "[Schwenker] doubled his losses last year because he wasn't qualified to be controller, and he wouldn't hire someone (in that case, me) who was"; "His

19

misleading you is partly because he's clueless[,] [a]nd partly because he lacks integrity"; "You didn't have access to a lot of information because [Schwenker] wasn't going to share it with you, and you didn't know who knew where the bodies were buried"; "And it's pathetic that he has no idea what his lying and misrepresenting is causing me and a ton of other people who are being very badly impacted by his malpractice"; "But I am pissed that I trusted [Schwenker] would do the right thing when it's not in his character."  Finally, defendant suggested to Pearson, "Well, you might need to let [Schwenker] know that if [the financial liability from the earlier festival] doesn't get resolved there won't be a show this year, and he is on the hook for fraudulently representing his entity to you."  Defendant sent all these text messages before Pearson allegedly repudiated the funding contract on June 26, 2018.

It is true that some of defendant's text messages to Pearson were critical of the band selections Schwenker's creative team had proposed.  But "the focus of our inquiry must be on 'the specific nature of the speech,' rather than on any 'generalities that might be abstracted from it.' " (*FilmOn, supra,* 7 Cal.5th at p. 152.)  The complaint's allegations and the evidence presented in connection with defendant's special motion to strike confirm that plaintiff has sued defendant for making *personally* disparaging remarks about its managing member's integrity in *private* text exchanges with plaintiff's chief *financial* backer that allegedly disrupted plaintiff's contractual and economic relationship with that investor.  These disparaging remarks were seemingly motivated by defendant's admitted refusal to "trust anything out of [Schwenker's] mouth" and his conviction that Schwenker "reneg[ed] on every offer" that defendant believed

20

he had received about his role in producing the Festival.  While defendant can point to some messages where he criticized creative decisions in urging Pearson to support his expanded role in the Festival's production, that is insufficient to demonstrate his private text messages "participated in, or furthered, the discourse that makes [a music festival] an issue . . . of public interest."  (*Id*. at p. 151.)  Defendant "cannot merely offer a 'synecdoche theory' of public interest, defining [his] narrow dispute by its slight reference to the broader public issue." (*Id*. at p. 152.)

Neither *Murray, supra,* 55 Cal.App.5th 10, nor *Ojjeh, supra*, 43 Cal.App.5th 1027, compels a different conclusion. The plaintiff in *Murray* sued his former partner in a dental practice for defamation after the defendant told a group of individuals, including the plaintiff's new employer, that the plaintiff had engaged in substandard dental work.  (*Murray,* at p. 15.)  Applying the *FilmOn* analysis, the *Murray* court held the statements made to the employer were protected under the anti-SLAPP statute's catchall provision, reasoning that "a dentist's competence to perform dental work" is an issue of public interest and the communications to plaintiff's new employer "promoted the public conversation on that issue because they were made to a person who had direct connection to and authority over the patient population with whom [the plaintiff] was working at the time."  (*Murray,* at p. 35.)  The court emphasized that in communicating with the employer, the defendant expressly stated "he wanted to 'protect' [the employer's] patients from 'substandard care.' "  (*Ibid*.)

To be sure, Pearson, like the plaintiff's employer in *Murray*, had some authority through the funding contract to shape the

21

public's experience of the music festival. But, as we have discussed, unlike in *Murray*, the context of defendant's private text exchange with the Festival's chief financial backer does not support the premise that defendant intended his disparaging remarks about Schwenker to be communicated to the public or to influence Pearson's exercise of that authority.[4] Rather, this context shows defendant was primarily motivated by his conviction that Schwenker had "broken" the "agreements and assurances" made to defendant about defendant's assumed role in the Festival's production. And, consistent with that conviction, defendant's apparent purpose was to warn Pearson that Schwenker was also "misleading" the investor about the Festival's production and anticipated financial performance. This personally motivated conduct that, according to Schwenker's declaration, Pearson foreseeably used to repudiate his financial relationship with plaintiff, is a far cry from the defendant's communication in *Murray* for the purpose of " 'protect[ing]' [the employer's] *patients* from 'substandard care.' " (*Murray, supra,* 55 Cal.App.5th at p. 35, italics added; see *FilmOn, supra,* 7 Cal.5th at p. 153 [reports regarding contents of public website, communicated "privately, to a coterie of paying clients" that clients used "for their business purposes alone" not protected under catchall provision]; *Xu v. Huang* (2021) 73 Cal.App.5th 802, 806, 819 [statements that a business competitor was

---

[4]  Indeed, although the funding contract gave Pearson authority to approve the Festival's headliners, Pearson informed defendant that he saw the Festival as "[Schwenker's] show" and his role as "just consulting on it as a requirement of the investment."

22

"dishonest and unethical in [his] business practices," "made in private settings and for the purpose of increasing the sales of the speaker, who was not a neutral or disinterested 'third party' ostensibly seeking 'to aid and protect consumers' " was not protected speech under catchall provision].)

In *Ojjeh*, the defendants solicited and obtained a $180,000 investment from the plaintiff to produce a documentary film on the Syrian refugee crisis. (*Ojjeh, supra,* 43 Cal.App.5th at p. 1032.) The plaintiff later sued, claiming that "no 'significant' or 'substantial' work had been performed on the film, and that defendants had breached their contractual obligations, [and] defrauded him of his investments." (*Ibid.*) Because the film was never completed or displayed to the public, the plaintiff argued "there was no 'actual speech' that qualified for protection," even though the Syrian refugee crisis was an issue of public interest. (*Id.* at p. 1040.) The *Ojjeh* court disagreed, holding the "solicitation of investment funding [was] reasonably viewed as conduct in furtherance of the documentary's production." (*Ibid.*) Although the documentary was not completed, the court reasoned anti-SLAPP protection was nonetheless warranted and vital, as a lawsuit targeting that sort of preliminary activity "threatens to chill participation in speech-related processes and, if successful, may block the exercise of free speech." (*Id.* at p. 1042.)

Defendant cites *Ojjeh* for the proposition that conduct in furtherance of the production of a creative project is protected. We do not disagree, but defendant's conduct in this case simply is not analogous to the conduct of the defendants in *Ojjeh*. As the *Ojjeh* court recognized, the defendants' solicitation of investment funds warranted protection because those actions "assist or are helpful in advancing the exercise of the right of free speech, even

if the speech activity is still formative or incomplete at the time a lawsuit is filed." (*Ojjeh, supra,* 43 Cal.App.5th at p. 1041.) Although the parties here were engaged in the preparation of a large public music festival, personal attacks on the character and integrity of plaintiff's managing member, privately communicated to the Festival's chief financial backer, cannot have been contemplated to assist or to help the preparation of that public event.

Having assessed the content and context of the conduct giving rise to defendant's alleged liability, we conclude defendant failed to establish plaintiff's claims arise from "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subdivision (e)(4).)  Because defendant's failure to satisfy the first prong of the anti-SLAPP analysis is fatal to his special motion to strike, we do not reach the second prong regarding plaintiff's probability of prevailing on its claims.[5] (*Navellier, supra,* 29 Cal.4th at p. 89.)

---

[5]     Defendant's motion to augment the record is denied.  The motion concerns evidence relevant to the second prong analysis obtained after the trial court entered its order on the special motion to strike.  That evidence is irrelevant to our disposition of this appeal.

## DISPOSITION

The order is reversed.  Plaintiff The One Experience is entitled to its costs.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

EDMON,  P. J.

KALRA, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.